**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━

DERRICK M. HAMILTON,

                           Plaintiff,

          v.
                                                            No. 9:18-CV-1312
NEW YORK STATE DEPARTMENT                                    (MAD/CFH)
OF CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                           Defendants.
━━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**                            **OF COUNSEL:**

Derreck M. Hamilton
89-A-5202
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021
Plaintiff pro se

Attorney General for the                    MELISSA A. LATINO, ESQ.
State of New York                           Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

          Plaintiff pro se Derreck M. Hamilton ("plaintiff"), an inmate who was, at all

relevant times, in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983,

───────────────────────

[1]  This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

alleging that defendants Acting Commissioner of DOCCS, Anthony Annucci ("Annucci"); Superintendent of Auburn Correctional Facility ("Auburn C.F."), Harold Graham ("Supt. Graham"); DOCCS Deputy Commissioner of Programs, Jeffery McKoy ("McKoy"); DOCCS Director of Ministerial, Family and Volunteer Services ("DMVS"), Cheryl Morris ("Morris"); DOCCS Director of DOCCS Bureau of Internal Controls, Paul Guenette ("Guenette"); former Auburn C.F. Deputy Superintendent for Programs, Galyn Schenk ("Schenk"); Auburn C.F. Steward, Debra Vanni ("Vanni"); Auburn C.F. Food Services Commissioner, Anthony Bertonica ("Bertonica"); Auburn C.F. Correction Sergeant, Jeffrey Porten ("Sgt. Porten"); former Auburn C.F. Inmate Organization Coordinator, David Porter ("Porter"); Auburn C.F. Recreation Program Leader, Ron Pitoniak ("Pitoniak"); Staff Advisor, Travis Silcox ("Silcox"); and Auburn C.F. Correction Officers, Alec Venditti ("C.O. Venditti"), Michael Delfavero ("C.O. Delfavero")—who, at all relevant times, were employed by DOCCS—violated his rights under the First and Fourteenth Amendments.  See Dkt. No. 15 ("Amen. Compl.").

The following of plaintiff's claims survived the Court's sua sponte review pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b): (1)  First Amendment Free Exercise Clause and Fourteenth Amendment Equal Protection Clause claims against Graham, Venditti, and Delfavero concerning the October 31, 2015 Transfiguration Day celebration; (2) First Amendment Free Exercise Clause and Fourteenth Amendment Equal Protection Clause claims against Graham based on the time provided for Rastafarian worship in the Auburn C.F. chapel on December 27, 2015; (3) Fourteenth Amendment Equal Protection Clause claim against Graham based on the number of Rastafarian inmates permitted to enter the chapel to worship on February 14, 2016; (4)

2

First Amendment retaliation claims against based on Graham's and Sgt. Porten's alleged threats of confining plaintiff to Special Housing Unit ("SHU") if he continued to attend Rastafarian religious services; (5) First Amendment Free Exercise and Establishment Clause claims against Annucci, McKoy, Morris, Guerette, and Graham for allegedly establishing and/or revising DOCCS policy to permit homosexual inmates to prepare and/or service food to Rastafarian inmates; (6) First Amendment Free Exercise Clause and retaliation claims against Bertonica for allegedly forcing plaintiff to eat food served to him by homosexual inmates and issuing plaintiff a false misbehavior report in retaliation for filing a grievance about the purported pro-homosexual food handling policy; (7) First Amendment claim alleging that Schenk, Vanni, Porter, Silcox, and Pitoniak retaliated against him for speaking out against purported misappropriation of funds in the Caribbean African Unity ("CAU") account by suspending the CAU.  See Dkt. No. 16 at 49.  Presently pending before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. See Dkt. No. 59.  Plaintiff filed a response in opposition to defendants' motion.  See Dkt. No. 79.  For the reasons that follow, it is recommended that defendants' motion be granted in part and denied in part.

# I. Background

## A. Plaintiff's Factual Assertions and Claims[2]

---

[2]  To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.  See subsection II.A., infra.

### 1. Transfiguration Day 2015

Plaintiff was transferred from the Great Meadow Correctional Facility ("Great Meadow C.F.") SHU to the Auburn C.F. SHU on October 21, 2015.  See Amen. Compl. at 15 ¶ 66.  Plaintiff knew that other Rastafari inmates at Auburn C.F. would celebrate Transfiguration Day on November 2, 2015.  See id. at ¶ 71.  Therefore, plaintiff wrote to "members of the []Auburn[ C.F.] administration on arrival, including . . . Graham[,] informing them that all disciplinary sanctions against [him] would end on October 30, 2015."  Id. at ¶ 69.  Plaintiff states that he "also wrote [former] defendant Tomandl informing him when [his] disciplinary sanctions ended and [his] desire to be placed on all Rastafari call-outs, for [c]lasses and services ("Nyahbinghi")," including Transfiguration Day.  Id. at 16 ¶ 71.  Plaintiff did not receive any response to his correspondence from Tomanld, the Rastafari staff advisor, or any other member of the Auburn C.F. Administration.  See id. at 16-17 ¶ 73.  Plaintiff contends that "[s]imilarly situated prisoners who belong to other faith groups, especially mainstream Christians and Muslims . . ., who wrote pre-SHU release letters were allowed to attend their religious commemorations upon release."  Id. at 17 ¶ 74.

Plaintiff alleges that, at 7:00 a.m. on October 30, 2015, he "informed staff" that he had completed his SHU sanctions "and presented the hearing disposition as proof."  Amen. Compl. at 17 ¶ 75.  Plaintiff alleges that, sometime that afternoon, the SHU supervisor informed him that he would not be released until the next day "per orders

4

from our supervisor" because plaintiff had "pissed somebody off." Id. at ¶ 76.  On October 31, 2015, plaintiff was released from SHU and moved to a general population cell.  See id. at ¶ 79.

During the morning go-around on November 2, 2015, plaintiff asked C.O. Delfavero to place him on the list to attend Transfiguration Day.  See Amen. Compl. at 17 ¶ 82.  C.O.s Delfavero and Venditti refused to allow plaintiff to attend the Transfiguration Day celebration on the basis that plaintiff was listed "as a Jew" and, therefore, was not allowed to attend a Rastafari event.  Id. at 18 ¶ 88.  Plaintiff states that he explained the significance of Transfiguration Day in the Rastafari faith, "objected" to being characterized as Jewish, informed those defendants that Captain ("Capt.") Diego had granted him oral permission to attend the event, and requested that C.O.s Delfavero and Venditti call the chaplain's office or Capt. Diego to confirm that he was not Jewish.  Id. at 19 ¶ 89; see id. at ¶ 93.  In response, C.O.s Delfavero and Venditti threatened to issue plaintiff a misbehavior report.  See id. at ¶ 93.  Plaintiff posits that C.O.s Delfavero's and Venditti's actions "substantially burdened [his] sincerely held religious beliefs" by causing him to miss out on the "highest form of [Rastafari] worship."  Id. at ¶¶ 94, 95.  Plaintiff further contends that C.O.s Delfavero and Venditti "imposed additional substantial burdens on [his] free exercise of [his] religious beliefs" by preventing other Rastafari inmates "from delivering [his Transfiguration Day] sacramental meal, by claiming [he] was 'Jewish.'"  Id. at ¶ 99.  In response to C.O.s Delfavero's and Venditti's actions, plaintiff alleges that he filed grievance No. AUB-68310-15.  See id. at 22 ¶ 113.

Liberally construed, the Amended Complaint alleges that Supt. Graham, C.O. Delfavero, and C.O. Venditti violated plaintiff's First Amendment right to freely exercise his religion by preventing him from attending the Transfiguration Day celebrations and receiving his sacramental meal by erroneously labeling him as Jewish. See Amen. Compl. at 18-19 ¶¶ 88, 99. Further, plaintiff alleges a Fourteenth Amendment Equal Protection Clause violation against Graham, C.O. Delfavero, and C.O. Venditti for failing to place him on the call-out and feed-up lists, as they did with "[s]imilarly situated prisoners who belong to other faith groups, especially mainstream Christians and Muslims." Id. at 17 ¶ 74.

### 2. Time and Numerical Limitations on Rastafarian Worship

Plaintiff alleges that, on December 27, 2015, Supt. Graham limited plaintiff's Rastafarian worship in the Auburn C.F. chapel to five minutes from 10:20 a.m. until 10:25 a.m. See Amen. Compl. at 22 ¶¶ 115-116. However, plaintiff alleges that, "while [he] was arbitrarily denied the right to free exercise of [his] sincerely held religious [b]elief, on that same day the similarly situated" Protestant prisoners were afforded two-and-a-half hours for their services. Id. at ¶ 117. Plaintiff filed grievance No. AUB-68521-15 relating to this incident. See id. at 23 ¶ 118. Further, plaintiff alleges that, on February 14, 2016, Supt. Graham ordered correction officers to allow only five Rastafari inmates into the chapel at time to worship, while Protestant inmates were allowed into the chapel "en masse." Id. at 23 ¶ 121; see id. at 32 ¶ 168.

Liberally construing the Amended Complaint, plaintiff alleges that Supt. Graham violated his First Amendment right to freely exercise his religion by limiting the time and

the number of participants for the Rastafarian services on December 27, 2015, and February 14, 2016, respectively.   See Amen. Coml. at 31, 32 ¶¶ 165, 168.  Plaintiff also alleges Fourteenth Amendment Equal Protection violations against Supt. Graham based on the foregoing alleged limitations on Rastafarian services, which he posits were not imposed on Protestant inmates.  See id. at 22, 31 ¶¶ 117, 166.

### 3. Threats of SHU Confinement

Plaintiff alleges that, on February 25, 2016, Sgt. Porten and Graham "sought to have [plaintiff] removed from all Rastafari call-outs, by threatening . . . [the inmate facilitator] to say [that plaintiff] was disrupting the order of the nyahbinghi."  Amen. Compl. at 25 ¶ 136.  According to plaintiff, Tomandl ignored the [inmate facilitator's] explanation that, "as a learned Elder, [plaintiff] had the right and Ecclesiastical obligation to steer the 'Reasoning' during the nyahbinghi," and informed plaintiff that Supt. Graham and Sgt. Porten "were seeking to have [plaintiff] 'silenced.'"  Id. at 26 ¶ 137.  Plaintiff filed grievance No. AUB-68944-16.

"[W]hile allegedly investigating [grievance No.] AUB-68944-16," plaintiff contends that Sgt. Porten "fabricated a report claiming that [the inmate facilitator] . . . had informed him that" Morris "was unaware of any problems and in his opinion, the services were running very smoothly[.]"  Amen. Compl. at 26-27 ¶ 143.  Further, plaintiff alleges that Sgt. Porten, purportedly under orders from Supt. Graham, informed him, "'you will not be allowed to participate during the []Rastafari[] services,'" and that if he did, "[i]t w[ould] be a short ride back to SHU.'"  Id. at 27 ¶ 144.  Plaintiff states that, "[Sgt.] Porten's threat [of SHU confinement] on behalf of defendant [Supt.] Graham effectively

silenced" him and "ended [his] Free Exercise of [his] sincerely held Rastafari [b]elief, within the weekly nyahbinghi." Id. at ¶¶ 145, 146. Liberally construed, plaintiff alleges that Supt. Graham and Sgt. Porten violated his First Amendment right to freely exercise his religion by threatening that, if he participated in Rastafari services, he would be placed in SHU. See id.

### 4. Food Handling and Service

On October 2, 2017, when plaintiff entered the Auburn C.F. mess hall to receive his "'therapeutic diet,'" he "noticed that a known 'openly' homosexual inmate was serving the 'diet' meals." Amen. Compl. at 47 ¶ 2. Plaintiff alleges that it is "against the strict heterosexual tenets of Rastafari's Ecclesiastical Laws for an adherent to consume food of any kind, known to be prepared, served or distributed by homosexuals[.]" Id. at ¶ 3. Therefore, plaintiff posits, by allowing homosexual inmates to prepare and serve his food, "DOCCS[] . . . forced [him] to choose between treating [his] serious medical need, or fulfilling [his] vow of fidelity to the . . . tenets of Rastafari and the Free Exercise of [his] sincerely held Spiritual Truth at the Heart of [his] Rastafari way of life." Id. at ¶ 3. Plaintiff avers that allowing homosexual inmates to serve him food was an attempt by DOCCS to "use its[] disciplinary apparatus . . . to force [his] participation in their anti-Human 'homosexual lifestyle'[.]" Id. at ¶ 1.

On October 4, 2017, plaintiff wrote to Bertonica to explain the "conflict DOCCS[] created by changing its policy and putting a homosexual server on the diet line, and that as a Rastafarian [he] was strictly forbidden 'from eating any food known to be prepared, or served by homosexuals.'" Amen. Compl. at 48 ¶ 7. Plaintiff notified Bertonica that

8

he "would not be signing for or eating the medical diet meal served in the north messhall as long as there was an open homosexual serving the meal." Id. at ¶ 8. In response, Bertonica notified plaintiff that "[a]ll offenders employed in the food service area are properly trained in the safe and hygiene [sic] handling of foods and serving areas." Id. at ¶ 9. On October 16, 2017, plaintiff responded to Bertonica and "reiterated [his] sincerely held Rastafari [b]eliefs . . . not to buy into[] the state-mandated perception of homosexuality as normal generative [h]uman behavior." Id. at ¶ 10. On October 19, 2017, in "direct response" to plaintiff's October 16, 2017 letter, Bertonica issued plaintiff a misbehavior report that charged plaintiff with missing 12 meals. Id. at ¶ 11. Plaintiff contends that Bertonica issued the misbehavior report in order to "forc[e his] conversion to and participation in DOCCS' imposition of the state's pro-homosexual agenda . . . ." Id. On October 25, 2017, plaintiff filed Grievance No. AUB-73025-17,[3] in which he "complain[ed] of . . . Bertonica['s] and Annucci's nefarious use of despicable means including food deprivation and denial of medical treatment to coerce [him] into accepting and participating in the state's homosexual construct." Id. at 49 ¶ 13. Plaintiff avers that, under the prior policy of nonparty Rastafari Chaplain Fox, inmates were permitted to serve meals to inmates of the same religious faith. See id. at 52 ¶ 32. However, plaintiff contends that Annucci employed Chaplains Rose and Steward to "rewrit[e] Rastafari ecclesiastical doctrine" and create a new policy of food preparation and service that "accommodate[d] DOCCS' pro homosexual doctrine." Id. at 52, 57 ¶¶ 36, 64.

---

[3] Plaintiff's Grievance No. AUB-73025-17 is not contained in the record.

9

Liberally construed, the Amended Complaint alleges that, by changing DOCCS's food handling and service policy to allow homosexual inmates to prepare and serve Rastafari inmates food, Annucci, McKoy, Morris, Guenette, and Supt. Graham violated plaintiff's First Amendment rights under the Free Exercise and Establishment Clauses. See Amen. Compl. at 57 ¶¶ 61; see id. at ¶¶ 62-63. Further, the Amended Complaint may also be liberally construed to allege that Bertonica violated his First Amendment rights under the Free Exercise clause by failing to accommodate plaintiff's purportedly religious-based dietary needs insofar as he "failed to act" on plaintiff's complaints that plaintiff could not eat food prepared and/or served by homosexual inmates due to his sincerely held Rastafari beliefs. Id. at 55 ¶ 48; see id. at 48 ¶¶ 5-11. Moreover, plaintiff's Amended Complaint asserts a First Amendment retaliation claim based on Bertonica's action of issuing plaintiff an allegedly false misbehavior report in response to plaintiff's letters in which he attempted to explain that, to exercise his sincerely held religious beliefs, he could not eat food prepared and/or served by homosexual inmates. See id. at 48 ¶¶ 10-11.

### 5. Caribbean African Unity Account

At all times relevant to the claims in the Amended Complaint, plaintiff was the president of the Caribbean African Unity ("CAU"), a cultural organization that addressed the needs of Auburn C.F. inmates of Caribbean, African, and Central and South American ancestry. See Amen. Compl. at 66 ¶ 2; n. 16. Plaintiff alleges that, pursuant to DOCCS Directive 4760, all such cultural organizations must contribute, at minimum, 50% of the profit from fundraising activities within each fiscal year to the Inmate

Occupational Therapy Fund ("IOTF").  See id. at ¶ 4.  Plaintiff states that, prior to Schenk's arrival at Auburn C.F., Directive 4760 provided the formula for calculating profit as fundraiser income less fundraiser expenses.  See id.  Membership dues were not in the profit determination formula.  See id. at ¶ 6.  However, plaintiff alleges, upon her arrival at Auburn C.F., Schenk changed the formula for determining profit in a manner that violated Directive 4760 by including membership as part of the calculation to determine an organization's profit.  See id. at 66-67 ¶ 7.  Plaintiff alleges that, "major accounting errors began occurring" "[i]mmediately" after Schenk implemented the new method of determining profit.  Id. at 67 ¶ 10.  In particular, plaintiff avers that "organization's funds grossly favor[ed] the IOTF and that the organization's accounts would be overcharged, after which it would take "months . . . before a single overdraft line would be corrected[] and the money properly credited to the organization."  Id. Plaintiff characterizes the overdrafts as "embezzlement."  Id. at ¶ 11.

In August 2017, plaintiff began to "question the illegal siphoning methods of funds from the CAU's trust account."  Amen. Compl. at 67 ¶ 12.  Shortly after plaintiff raised his concerns, he "received a [memo] from . . . Pitoniak," which stated that CAU was "'non-compliant with the membership quota of Directive []4760' and was therefore 'on a 60-day probation.'"  Id. at 67-68 ¶ 12.  Further, in September 2017, in response to plaintiff addressing discrepancies in the CAU's trust account with Pitoniak and Porter, they advised plaintiff, "you shouldn't make a big stink about it."  Id. at 68-69 ¶ 19.  In January 2018, plaintiff attempted to discuss the CAU with Pitoniak, but Pitoniak had an "outburst" in which he used racial slurs.  See Amen. Comp. at 69 ¶ 21.  Plaintiff filed grievance No. AUB-73415-18 concerning Pitoniak's purported actions.  See id. at ¶ 24.

11

In February 2018, plaintiff wrote to Vanni and requested an audit of the CAU's trust account, and noted that he had observed discrepancies between the CAU's accounting, and the monthly statements provided by the Auburn C.F. business office. See id. at 69 ¶ 26.  Plaintiff contends that Vanni did not respond in writing, assured plaintiff orally that he would conduct the requested audit, but ultimately never did.  See id. at ¶ 27.

In May 2018, plaintiff states that CAU members informed him that Pitoniak had approached them and "attempted to enlist them in a scheme to have [plaintiff] removed as President of the CAU . . . ."  Amen. Compl. at 70 ¶ 28.  Plaintiff alleges that Pinoniak informed the CAU members he approached that Sgt. Porten and Schenk also wanted plaintiff removed from his position as president.  See id. at ¶ 30.  Pitoniak also allegedly informed the CAU members that Morris was willing to help him remove plaintiff as president of the CAU.  See id. at ¶ 31.  Plaintiff filed grievance No. AUB-74417-18 concerning Pitoniak's alleged scheme.  See id. at ¶ 32.

On June 5, 2018, plaintiff sent a memorandum to Vanni to address the matter of $91.00 in membership dues had been counted as sales and, therefore, towards the CAU's profits.  See Amen. Compl. at 70 ¶ 34.  When the June 5, 2018 memorandum went unanswered, plaintiff "personally explained to . . . Schenk, Porter, Silcox, Pitoniak and Vanni that they were illegally taking 50% of [the CAU's] sales, not [its] profits."  Id. at 71 ¶ 35.  On June 6, 2018, plaintiff wrote to Schenk and Vanni to report "the [t]heft of 4 cases of individually wrapped muffins purchased for the CAU's June 1, 2018 [g]eneral [m]embership [m]eeting."  Id. at 72 ¶ 43.  After reporting the theft, plaintiff alleges that Pitoniak cancelled his weekly meetings with plaintiff, during which Pitoniak, in his

12

capacity as CAU staff advisor, would discuss CAU business matters with plaintiff.  See id. at ¶ 44.  Pitoniak's cancellation of the weekly meetings caused the CAU's membership dues to no longer be processed.  See id. at ¶ 47.  Plaintiff also states that the CAU's purchase orders for fundraiser supplies "[a]bruptly" stopped at this time.  Id. "Effectively," plaintiff posits, "the CAU was being administratively stifled[.]"  Id. at 73 ¶ 48.

In a memorandum dated September 6, 2018, Silcox announced the suspension of the CAU.  See Amen. Compl. at 73 ¶ 50.  Silcox indicated that the suspension was due to poor attendance, lack of programs, and paid membership being below 20% of the approved size.  See id. at ¶ 51.  Plaintiff contends that the reasons stated in Siclox's memorandum were "all areas in which defendants had manufactured an artificial crisis by their acts-of-omission [sic] and failure to execute their duty to the CAU . . . ."  Id. Although the CAU was "technically suspended," plaintiff states that, on October 3, 2018, he filed a grievance on its behalf (grievance No. AUB-75138-18), alleging that staff had retaliated against the CAU because of his good-faith efforts in reporting the theft of the muffins and misappropriation of CAU funds.  Id. at ¶ 53.

Plaintiff alleges that, on October 4, 2018, Silcox threatened plaintiff that if he continued to correspond on behalf of CAU, he would be sent to SHU.  Amen. Compl. at 74 ¶ 54.  On October 7, 2018, "under the direct threat of retaliation," plaintiff states that he wrote to Annucci to inform him of the events surrounding the suspension of the CAU. Id. at ¶ 55.  On October 28, 2018, Schenk responded "'to the packet of letters' sent to '[] Annucci'[] in a memo."  Id. at ¶ 56.  Schenk informed plaintiff that Auburn C.F. would reimburse the CAU for the items ordered, but not received, by the organization.  See id.

However, plaintiff alleges that, because the CAU was suspended, the CAU had no one in place to acknowledge or record that the reimbursement took place, and the "funds would automatically be added to . . . Schenk's IOTF purse, becoming available to be used for employees' routine off-the-books super bowl, [C]hristmas parties . . ., etc.[]" Id. at ¶ 57.

Liberally construed, plaintiff asserts that Pitoniak violated his First Amendment rights by suspending the CAU in retaliation for plaintiff questioning the discrepancies in the organization's accounting and theft of items purchased by the CAU. See Amen. Compl. at  72-72 ¶¶ 43-44, 47-48.  Plaintiff also alleges First Amendment violations against Vanni, Porter, and Silcox based on their purported failure to process purchase orders, membership dues, and callouts, in retaliation for plaintiff filing grievances.  See 77 ¶¶ 73, 74 (Vanni); 78 ¶ 78 (Porter); 79 ¶ 81 (Silcox).  Further, plaintiff alleges that Schenk violated his First Amendment rights by authorizing the suspension of the CAU in retaliation for plaintiff filing grievances alleging that she embezzled the CAU's money. See id. at 76 ¶ 69.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of

14

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)). Furthermore, "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

15

Where, as here, a party seeks judgment against a <u>pro se</u> litigant, a court must afford the non-movant special solicitude.  See <u>Treistman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

<u>Id.</u> (internal quotation marks, citations, and footnote omitted); <u>see also Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally." (internal quotation marks and citations omitted)).

### III. Analysis[4]

### A.  Failure to Identify and/or Serve Certain Defendants

### 1. Doe Defendants

Plaintiff filed his Amended Complaint on May 7, 2019, in which he named as defendants three John Doe Watch Commanders, Auburn Prison Guards John Doe and

---

[4]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

James Doe, Sgt. Doe, and Jay Doe Yard Supervisor.  See Amen. Compl. at 1.  In its

June 4, 2019 decision and order, the Court warned plaintiff that he

> must take reasonable steps to ascertain through discovery
> the identity of [the Doe defendants].  Upon learning the
> identities of the unnamed defendants, [p]laintiff must amend
> the operative complaint to properly name those individuals
> as parties.  If [p]laintiff fails to ascertain the identity of the . . .
> Doe defendants so as to permit timely service of process, all
> claims against those individuals will be dismissed.

Dkt. No. 16 at 47-48.  The Court also informed plaintiff that, "Rule 4 of the Federal Rules

of Civil Procedure require[s] that a party be served within 90 days of issuance of the

summons, absent a court order extending that period. FED. R. CIV. P. 4(m).  The Court's

local rules shorten the time for service from 90 days under Rule 4(m) to 60 days.

N.D.N.Y. L.R. 4.1(b)." Id. at 48 n. 16.

Plaintiff did not identify the Doe defendants until he submitted his response in

opposition to defendants' motion for summary judgment on July 12, 2021, which is

dated June 27, 2021.  See Dkt. No. 79 at 1-3 ¶ 2.  It is undisputed that none of the Doe

defendants have been served.  Over two years passed between the Court's warning in

its June 4, 2019 Decision and Order that plaintiff was required to identify and serve all

defendants named in his Amended Complaint and plaintiff's response in opposition to

defendants' motion dated June 27, 2021—far beyond the usual 120 days to identify and

serve a defendant. See FED. R. CIV. P. 4(m).  During this more than two-year period,

the discovery deadline was reset four times, affording plaintiff ample opportunity to

identify and/or serve all of the Doe defendants.  See Text Orders, dated Apr. 18, 2020;

June 5, 2020; Sept. 1, 2020; and Sept. 24, 2020.  Plaintiff's failure to do so, therefore,

has not been the result of lack of opportunity.  Moreover, plaintiff did not, as instructed,

"amend the operative complaint to properly name those individuals as parties." Dkt. No. 16 at 47. Consequently, it is recommended that plaintiff's claims, insofar as asserted against the Doe defendants, be dismissed. See Taft v. Fricke, No. 9:17-CV-0346 (GTS/CFH), 2019 WL 5197180, at *1 (N.D.N.Y. July 26, 2019) (recommending dismissal of the pro se plaintiff's claims against John Doe defendants who the plaintiff failed to identify and serve process on in the more than two years that passed between the filing of his complaint and the Report-Recommendation and Order on the defendants' motion for summary judgment), report and recommendation adopted, No. 9:17-CV-0346 (GTS/CFH), 2019 WL 4744225 (N.D.N.Y. Sept. 30, 2019).

### 2. Pitoniak

Plaintiff named Pitoniak as a defendant in his Amended Complaint. See Amen. Compl. at 1. As plaintiff was proceeding in forma pauperis ("IFP"), the Court instructed that service of process be effectuated by the U.S. Marshal upon receipt from plaintiff of the documents required for service. See Dkt. No. 16 at 49. On July 28, 2019, the U.S. Marshal issued a summons to, among others, Pitoniak. See Dkt. No. 20. However, on September 23, 2019, the summons was returned unexecuted as to Pitoniak. See Dkt. No. 24. The U.S. Marshal reissued the summons to Pitoniak on October 25, 2019, see Dkt. No. 30, but it was again returned unexecuted on November 22, 2019. See Dkt. No. 33.

Defendants point out that service was twice unexecuted as to Pitoniak because "he was not an employee of Auburn [C.F.]" Dkt. No. 60 at 5 n. 1. Further, defendants note that, because Pitoniak has not been served, the Attorney General's "office has not

18

been able to ascertain whether he would request representation from th[at] office pursuant to [N.Y. Pub. Offic. Law] § 17." Id.  Moreover, defendants argue, the Amended Complaint "should be dismissed agasint [sic] . . . Pitoniak for lack of personal jurisdiction." Id.  Plaintiff does not raise any arguments concerning service of process as to the Doe defendants or Pitoniak. See Dkt. No. 79; Dkt. No. 79-1; Dkt. No. 79-2.  It is undisputed that, to date, Pitoniak has not been served with process in this action.

As indicated above, a plaintiff has 90 days to serve a defendant with process after the complaint is filed. See Fed. R. Civ. P. 4(m).  Where, as here, the plaintiff is proceeding IFP, service may be effectuated by the U.S. Marshal. See Fed. R. Civ. P. 4(c)(3); 28 U.S.C. § 1915(d).  It is true that a pro se plaintiff, proceeding IFP may rely upon the Marshal to properly serve the summons and complaint. See Romandette v. Weetabix, 807 F.2d 309, 311 (2d Cir. 1986); see also Kingsberry v. City of New York, No. 15CV1481 (DLC), 2016 WL 2851336, at *2 (S.D.N.Y. May 13, 2016) ("Once a party is granted the right to proceed in forma pauperis, it 'shift[s] the responsibility for serving the complaint from [the plaintiff] to the court.'" quoting Wright v. Lewis, 76 F.3d 57, 59 (2d Cir. 1996)).  "A party proceeding [IFP], however, is not relieved of all responsibility to effectuate service on the defendants." Kingsberry, 2016 WL 2851336, at *2.  The Second Circuit has held that "[i]f a plaintiff proceeding IFP chooses to rely on the Marshals to serve the relevant parties, and it becomes apparent that the Marshals will not accomplish this by the Rule 4(m) or court-ordered deadline, []he must advise the district court that []he is relying on the Marshals to effect service and request a further extension of time for them to do so." Meilleur v. Strong, 682 F.3d 56, 63 (2d Cir. 2012).

Here, the U.S. Marshal's second attempt to serve process on Pitoniak was returned unexecuted on November 22, 2019.  See Dkt. No. 33.  Since that time—over a year and eighth months ago—plaintiff has not requested any further extension or made any effort whatsoever to effectuate proper service on Pitoniak.  Indeed, plaintiff had nearly 11 months between the time the second summons was returned unexecuted as to Pitoniak on November 22, 2019, and the close of discovery on October 9, 2020, to "request a further extension of time" to serve process on Pitoniak, but failed to do so. See Meilleur, 682 F.3d at 63.  Plaintiff does not address the issue of failing to timely serve Pitoniak, and has not so much as alluded to any good cause for the at least eleven month delay in raising the issue with the Court.  Consequently, it is recommended that plaintiff's claims insofar as asserted against Pitoniak be dismissed and that Pitoniak be dismissed as a defendant from this action.

## B. Exhaustion of Administrative Remedies

Defendants contend that plaintiff failed to exhaust his administrative remedies with respect to his First Amendment retaliation claims relating to the suspension of CAU, as contained in plaintiff's Grievance No. AUB-75138-18.  See Dkt. No. 60 at 19-21.  In support, defendants submit a certified copy of plaintiff's DOCCS Central Office Review Committee ("CORC") records, which "show[] any grievances appealed to and received by the . . . CORC for [plaintiff] . . ., as of December 18, 2020."  Dkt. No. 59-11 at 4.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims

20

arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be

brought with respect to prison conditions under section 1983 . . . by a prisoner confined

in any jail, prison, or other correctional facility until such administrative remedies as are

available are exhausted.").  The exhaustion requirement applies "'to all inmate suits

about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong.'"  Cucchiara v. Dumont,

No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019)

(quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).  Further, the exhaustion

requirement applies even where the prisoner seeks relief not available in the

administrative grievance process, such as money damages.  See Porter, 534 U.S. at

524.  "To exhaust administrative remedies, the inmate must complete the full

administrative review process set forth in the rules applicable to the correctional facility

in which he or she is incarcerated."  Cuadrado v. Brueault, No. 9:14-CV-1293

(DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549

U.S. 199, 218 (2007).

　　　　While the Supreme Court has deemed exhaustion mandatory, the Second Circuit

has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d

170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted).  Until recently,

courts in this District followed a three-part test established by the Second Circuit in

Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  Under the test established in

Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that

his or her failure to exhaust was justified by "special circumstances."  Id.  However, in

Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten

'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ____ U.S. ____ 136 S. Ct. 1850, 1862 (2016).  Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA.  See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to mandatory exhaustion."  Ross, ____ U.S. ____, 136 S. Ct. at 1858.  Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.

There is no genuine dispute that, at all relevant times, Auburn C.F. had in place a well-established three-step administrative procedure for inmate grievances known as the IGP, and that plaintiff was familiar with that process.  See N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5.  First, an inmate must file a grievance with IGRC.  See 7 NYCRR § 701.5(a)(1)-(b).  An adverse decision from IGRC is to be appealed to the superintendent of the facility, and an adverse decision of the superintendent must be

appealed to CORC.  See id. at § 701.5(c), (d).  "Grievances claiming employee

harassment, including claims of excessive force, "are of particular concern to the

administration of [DOCCS] facilities," and subject to an expedited procedure whereby

the grievance goes directly to the facility superintendent.  Hamlet v. Stotler, No. 9:17-

CV-0939 (GLS/TWD), 2018 WL 2729263, at *5 (N.D.N.Y. Apr. 27, 2018) (quoting 7

N.Y.C.R.R. § 701.8), report and recommendation adopted sub nom. Hamlett v. Stotler,

No. 9:17-CV-939 (GLS/TWD), 2018 WL 2727875 (N.D.N.Y. June 6, 2018).  The

superintendent is required to initiate an in-house investigation by higher ranking

supervisory personnel; request an investigation by the inspector general's office; or

request an investigation by the New York State Police Bureau of Investigation if the

superintendent determines that criminal activity may be involved.  See 7 N.Y.C.R.R. §

701.8(d).  "Within 25 calendar days of receipt of the grievance, the superintendent will

render a decision on the grievance and transmit said decision, with reasons stated to

the grievant."  Id. at § 701.8(f).  The inmate must then appeal an adverse decision to

CORC within seven calendar days of receipt of the Supervisor's decision.  See id. at §

701.8(h).  CORC has a 30-day deadline to respond to the appeal.  See Hayes v.

Dahlke, 976 F.3d 259, 270-71 (2d Cir. 2020) (citing 7 N.Y.C.R.R. § 701.5(d)(3)(ii)).

Regardless of whether the grievance is related to an assault, an appeal is not

exhausted until the inmate receives a final decision from CORC.  See Hamlet, 2018 WL

2729263, at *5.  "The defendant bears the burden of proving that the administrative

remedies available to the plaintiff were not exhausted prior to the initiation of a civil

action."  McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2

(N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust his Administrative Remedies

Defendants have met their burden of establishing that no genuine issue of material fact exists concerning plaintiff's failure to exhaust his administrative remedies prior to commencement of the present action with respect to his First Amendment retaliation claims against Schenk, Sgt. Porter, Silcox, Pitoniak, and Vanni for allegedly taking adverse actions against him in retaliation for plaintiff questioning the accounting practices used to calculate the CAU's profits and reporting the theft of the muffins, as asserted in Grievance No. AUB-75138-18.  Further, although not specifically raised by defendants, the admissible documentary evidence establishes that plaintiff did not fully exhaust his administrative remedies with respect to Grievance No. AUB-68944-16.  In addition, it also appears that plaintiff failed to exhaust his administrative remedies with respect to his First Amendment Free Exercise Clause claims against Supt. Graham and Sgt. Porten based on their alleged threats of SHU confinement if plaintiff participated in Rastafari services.

It is well settled that "a prisoner may not file suit . . . before the time in which CORC is supposed to issue a decision has expired."  Animashaun v. Afify, 470 F. Supp. 3d 294, 296 (W.D.N.Y. 2020); see Bowie v. Woodruff, No. 9:18-CV-0266 (BKS/ML), 2019 WL 7606078, at *5 (N.D.N.Y. Sept. 20, 2019) (holding that the pro se inmate failed to "fully exhaust his administrative remedies prior to filing [his] lawsuit," where CORC did not decide the plaintiff's administrative appeal until "approximately eight months

24

after [he] commenced [his federal] action."), report and recommendation adopted, No. 9:18-CV-00266 (BKS/ML), 2019 WL 5445519 (N.D.N.Y. Oct. 23, 2019); Feliz v. Johnson, No. 9:17-CV-1294 (DNH/ATB), 2019 WL 3491232, at *2 (N.D.N.Y. Aug. 1, 2019) (holding that the pro se inmate "did not fully exhaust his administrative remedies prior to commencing [his federal] action because he filed his federal complaint before completing the DOCCS grievance process," where the "plaintiff had not yet even appealed the relevant grievance to CORC at the time of filing this action."); see also White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit." (citations omitted)), report and recommendation adopted, No. 9:10-CV-1034 (GTS/DRH), 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011).

Defendants' submissions establish that plaintiff filed his appeal to CORC relating to Grievance No. AUB-75138-18 on October 15, 2018.  Dkt. No. 59-11 at 5.  However, plaintiff filed his Original Complaint on November 8, 2018—only 24 days after filing his appeal to CORC and slightly more than five months *before* CORC received his appeal relating to Grievance No. AUB-75138-18 on April 16, 2019.  See Dkt. No. 1; Dkt. No. 59-11 at 5.  Thus, defendants' admissible record evidence establishes that plaintiff failed to exhaust his administrative remedies, as he commenced his present lawsuit *before* CORC decided his administrative appeal and *before* plaintiff received a response relating to Grievance No. AUB-75138-18.  See Dkt. No. 1; Dkt. No. 59-11 at 5; Animashaun, 470 F. Supp. 3d at 296; Bowie, 2019 WL 7606078, at *5;  Feliz, 2019 WL 3491232, at *2; White, 2011 WL 4478988, at *3.

Moreover, although it is not apparent from the record whether or when CORC issued a decision on plaintiff's appeal, courts routinely dismiss claims for failure to exhaust administrative remedies under the PLRA even where CORC issues a decision *after* the plaintiff filed a federal complaint.  See Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020) ("[I]t is well-settled that subsequent exhaustion after suit is filed is insufficient and will not save a case from dismissal.") (internal quotations marks, brackets, ellipses, and citation omitted)); Scott v. Uhler, No. 9:16-CV-403 (TJM/CFH), 2019 WL 5197139, at *5 (N.D.N.Y. July 31, 2019) ("Receiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any such action must be dismissed . . . ." (citation omitted)), report and recommendation adopted, No. 9:16-CV-403 (TJM/CFH), 2019 WL 4667495 (N.D.N.Y. Sept. 25, 2019).  Consequently, it is recommended that plaintiff's First Amendment retaliation claims against Schenk, Sgt. Porter, Silcox, Pitoniak, and Vanni for allegedly taking adverse actions against him in retaliation for raising complaints concerning the CAU be dismissed as unexhausted.

In addition, plaintiff's CORC records establish that plaintiff did not file an appeal with CORC concerning Grievance No. AUB-68944-16, see Dkt. No. 59-11 at 5-6, and the appeal statement on the IGP Superintendent's determination was left blank.  See Dkt. No. 59-10 at 89.  Therefore, it appears that plaintiff's First Amendment Free Exercise claim based on Sgt. Porten's and Supt. Graham's alleged threats of SHU confinement in February  2016, which plaintiff states prevented him from participating in Rastafari services, is unexhausted.  See White, 2011 WL 4478988, at *3.  Plaintiff's First Amendment Free Exercise and Fourteenth Amendment Equal Protection claims

alleging that, on February 14, 2016, Supt. Graham ordered correction officers to allow only five Rastafari inmates into the chapel at time to worship, while Protestant inmates were allowed into the chapel as a group, as contained in Grievance No. AUB-68944-16, are, therefore, also unexhausted.  See Amen. Compl. at 23, 32 ¶¶ 121, 168.  Thus, it is recommended that plaintiff's First and Fourteenth Amendment claims against Supt. Graham relating to the February 14, 2016 Rastafari worship service be dismissed for failure to properly exhaust.  It is also recommended that plaintiff's First Amendment Free Exercise claims against Supt. Graham and Sgt. Porten based on the alleged threats of SHU confinement also be dismissed as unexhausted.

Based on the foregoing, it is recommended that plaintiff's First Amendment retaliations claims against Schenk, Sgt. Porter, Silcox, Pitoniak, and Vanni, as asserted in Grievance No. AUB-75138-18, and his First and Fourteenth Amendment claims against Graham relating to the February 14, 2016 Rastafari worship service, as well as his First Amendment claims against Supt. Graham and Sgt. Porten concerning the alleged February 2016 threats, insofar as asserted in Grievance No. AUB-68944-16, be dismissed for failure to exhaust administrative remedies.

### 2. Availability of Administrative Remedies

Plaintiff states that he exhausted all administrative remedies, and avers that his claims "were filed after the 30 days deadline to respond had expired therefore, the CORC's failure to meet its deadline mandate by its own directive meant the grievance process at that point became unavailable[.]"  Dkt. No. 79 at 35 ¶ 99.  Plaintiff posits that he filed his appeal with CORC relating to Grievance No. AUB-75138-18, but that CORC

left the appeal "unresolved for periods that far exceeded the 30 days it is allocated under DOCS own regulations[.]." Dkt. No. 79-2 at 11. Citing Hayes v. Dahlke (976 F.3d 259 (2d Cir. 2020)), plaintiff avers that CORC took "over eighteen (18) months" to resolve this grievance, and contends that his present claims were, therefore, "filed well after CORC violated the 30[-]day deadline mandated to respond after having received [his] appeal[,]" Id. at 11, 13.

As plaintiff points out, the Second Circuit has explained that, "the DOCCS [IGP] imposes a mandatory deadline for the CORC to respond, [and] an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." Hayes, 976 F.3d at 270. However, as the Second Circuit also held in Hayes, insofar as the plaintiff there only "waited only 26 days after the CORC received the appeal of his grievance against the superintendent, four days short of the 30-day deadline for the CORC to respond[,]" the plaintiff failed to exhaust his administrative remedies with respect his claims against the superintendent. Id. at 271 (citing 7 N.Y.C.R.R. § 701.5 (d)(3)(ii)). Here, plaintiff filed his complaint on November 8, 2018—only 24 days after filing his appeal to CORC concerning Grievance No. AUB-75138-18. See Dkt. No. 1; Dkt. No. 59-11 at 5. Thus, as in Hayes, plaintiff did not wait for CORC's 30-day deadline to respond to expire before filing suit. See Hayes, 976 F.3d at 271; 7 N.Y.C.R.R. § 701.5 (d)(3)(ii). Thus, because plaintiff filed suit before the 30-day deadline expired, he failed to his exhaust administrative remedies with respect to his First Amendment retaliation claims against Schenk, Sgt. Porter, Silcox, Pitoniak, and Vanni, as asserted in Grievance No. AUB-75138-18. Further, plaintiff does not contend, and the record evidence does not

demonstrate, that his administrative remedies were otherwise unavailable with respect to either Grievance No. AUB-75138-18 or AUB-68944-16.  See Dkt. No. 79 at 35-36 ¶ 99; Dkt. No. 79-2 at 11-13.

"Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint."  Bennett v. Columbe, No. 9:16-CV-653 (BKS/CFH), 2018 WL 5728042, at *5 (N.D.N.Y. July 17, 2018) (internal quotation marks and citation omitted), report and recommendation adopted, No. 9:16-CV-0653 (BKS/CFH), 2018 WL 4627663 (N.D.N.Y. Sept. 27, 2018). However, for the reasons discussed below, because the undersigned concludes that defendants are entitled to summary judgment on the merits, it is recommended that plaintiff's unexhausted claims be dismissed with prejudice.

## C. Merits

### 1. 2015 Transfiguration Day Celebration and Sacramental Meal

Defendants contend that plaintiff's First and Fourteenth Amendment claims against Supt. Graham, C.O. Venditti, and C.O. Delfavero relating to the 2015 Transfiguration Day celebration and sacramental meal should be dismissed as without merit.  See Dkt. No. 60 at 13-14.  First, defendants argue that plaintiff was released from SHU on October 31, 2015, instead of October 30, 2015, the last day of his SHU sentence, "because a safe and secure cell was not available until such time."  Id. at 13; Dkt. No. 59-10 at 67 (CORC determination indicating that plaintiff "completed his SHU sanctions on 10/30/15").  In support of this assertion, defendants proffer Supt. Graham's

29

declaration, in which he explains that "[f]rom [his] review of relevant documentation, on October 30, 2015, there was no general population cell available for [plaintiff], and he could not be safely and securely moved to general population until October 31, 2015." Dkt. No. 59-10 at 3 ¶ 13.  Supt. Graham denies instructing "any correctional official to not release [plaintiff] to general population on October 30, 2015 to violate his religious rights."  Id. at ¶ 14.  Supt. Graham also denies having personal involvement in the "decision as to when to release an inmate to general population or what cell in which to place an inmate at the facility[,]" and that those decisions are the responsibility of the Deputy of Security at Auburn C.F.  Id. at 3 ¶ 10.  Supt. Graham also denies instructing any correctional personnel to identify plaintiff as a Jewish inmate.  See id. at ¶ 14.

Supt. Graham explains that, "[r]osters for religious call-outs including holy days like Transfiguration Day, are processed 45 days in advance of the event.  Upon transfer to a facility within this 45-day period, however, an inmate may request to attend religious services by writing to the Chaplain."  Dkt. No. 59-10 at 4 ¶ 16.  However, Supt. Graham indicates, that it is not within his purview as Superintendent to take action concerning inmates' religious call-out requests, and denies taking any action with respect to plaintiff's request to attend Transfiguration Day in 2015.  See id. at ¶¶ 15, 17. Supt. Graham also denies having received a letter from plaintiff concerning his request to be placed on a religious call-out, and explains that any such letter sent to his office would have been forwarded to Schenk, as the Deputy Supt. of Programs.  See id. at ¶ 18.  Based upon his review of the documentation submitted by Auburn C.F. personnel and Deacon Tomnadl, Supt. Graham states that "there is no documentation to support

30

that [plaintiff] ever requested to be added to Transfiguration Day (November 2, 2015)."
Id. at ¶ 19.

Attached as an exhibit to Supt. Graham's declaration is the 2015 DOCCS
Religious Holy Day Calendar, which provides that "[i]nmates must be on a call-out in
order to attend worship services . . . ."  Dkt. No. 59-10 at 18.  "While it is not a
requirement for inmates to attend services/class in order to participate in the holy day
events for their faith group, they must submit a written request to participate in the
religious programs that they are interested in."  Id.  Further, the calendar provides that
Chaplains are generally expected to complete packages within 45 days, and that
"transfers who arrive after the deadline and request to participate in a religious event . . .
should be approved."  Id.

Defendants also submit C.O. Delfavaro's declaration in which he acknowledges
that he "did in fact refuse to allow [plaintiff] to attend the November 2, 2015
Transfiguration Day service" because plaintiff did not have written approval to attend
that service.  Dkt. No. 59-13 at 2 ¶ 11.  C.O. Delfavero also states that, although it is
rare than an inmate would be placed on a call-out list the same day as a religious
service, "if this were to happen it would have to be in writing."  Id. at 3 ¶ 13.  C.O.
Delfavero states that he is "not responsible or involved in the creation or maintenance of
the religious services call-out lists, nor [is he] responsible or involved in the creation of
religious meals."  Id. at 2 ¶ 10.  Further, C.O. Delfavero denies having any recollection
of checking plaintiff's religious designation, referring to him as Jewish, or denying him
the 2015 Transfiguration Day meal.  See id. at 3 ¶ 17, 4 ¶ 19.

31

Defendants also submit C.O. Venditti's declaration, in which he states that, on November 2, 2015, he informed plaintiff that he was not on the Transfiguration Day call-out list.  See Dkt. No. 59-14 at 2 ¶ 7.  Further, with respect to plaintiff's assertion that he added new arrivals of other religions to "feed-up" lists, C.O. Venditti states that he is "not responsible or involved in the creation or maintenance of the religious services call-out lists, nor [is he] responsible or involved in the creation religious meals."  Id. at 2 ¶ 10.  C.O. Venditti denies having any recollection of denying plaintiff the 2015 Transfiguration Day meal.  See id. at 4 ¶ 19.

Both C.O. Delfavero and C.O. Venditti explain that they informed nonparty Sgt. White during his investigation of plaintiff's grievance that they did not call plaintiff a Jew or Jewish so that he could not attend Transfiguration Day.  See Dkt. No. 59-13 at 3-4 ¶ 18; Dkt. No.  59-15 at 2 ¶ 11.  Moreover, C.O. Delfavero and C.O. Venditti explain that, regardless of plaintiff's assertion that he received oral permission to attend the 2015 Transfiguration Day service from Captain Diego, any "call-out appointments must be in writing for security purposes" and that "if an inmate is on a call-out without written approval, that individual would be 'out of place,' which could lead to disciplinary actions."  Dkt. No. 59-13 at 2 ¶ 11; Dkt. No. 59-14 at 2-3 ¶¶ 7, 12.

In opposition, plaintiff avers that defendants wrongfully denied his request to attend the 2015 Transfiguration Day service because he was placed on the Rastafari roster the day before he arrived at Auburn C.F.  See Dkt. No. 79 at 7 ¶ 6.  In support of this argument, plaintiff points to Sgt. White's February 29, 2016 memorandum concerning plaintiff's Grievance No. AUB-68310-15, which addressed the denial of plaintiff's request to attend the 2015 Transfiguration Day service.  See Dkt. No. 79-1 at

18.  In this memorandum, Sgt. White states, in relevant part, that, "[a]ccording to Deacon Tomandl, [plaintiff] was added to the Rastafarian roster the day before his arrival . . . at Auburn C.F." Id.  Sgt. White further states that "[t]here is no knowledge of [plaintiff] attempting to request to be added on the callout for Transfiguration Day or attempt to contact a Chaplain.  [Plaintiff] could have easily asked the Block Officer to contact [Sgt. White] to confirm his religious practice and [Sgt. White] could have made the necessary provisions." Id.  Plaintiff avers that "[t]he record . . . clearly reflects that [he] wrote to . . . Chaplain Tomandl and requested to be placed on the call-out for Rastafari Transfiguration Day . . . on or about October 24, 2015, within days of arrival at Auburn [C.F.]" Dkt. No. 79 at 8-9 ¶ 12.  Plaintiff avers that his request to be placed on the Rastafari roster was sufficient and that the 2015 DOCCS Religious Holy Day Calendar does not require inmates to request to participate in religious events in writing. See id. at 9-10 at ¶ 17.  He reiterates that Capt. Diego granted him oral permission to attend the 2015 Transfiguration Day service.  See id. at 10 ¶ 18.  Plaintiff contends that C.O.'s Delfavero's and Venditti's denial of his request to attend the 2015 Transfiguration Day service "stems directly from the acts and omissions of . . . [Supt.] Graham" "of subjecting plaintiff to an additional day of SHU confinement." Id. at 12 ¶ 28.

### a. Personal Involvement—Supt. Graham

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." Kinch v. Artuz, No. 97-CV-2419 (LAP), 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995) and Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Prior to deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation omitted)).

In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability.  Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'"  Id. at 618.[5]  The Second Circuit explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly."  Id. (quoting Iqbal, 556 U.S. at 676).  "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly."  Fabrizio v. Smith, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (collecting cases), report

---

[5]  Prior to Tangreti, Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

and recommendation adopted, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211023 (N.D.N.Y. June 1, 2021).

Here, defendants have proffered admissible evidence to establish that Supt. Graham was not personally involved in the alleged First Amendment violations relating to the 2015 Transfiguration Day service.  Plaintiff's contention that missing the event "stems directly from the acts and omissions of . . . [Supt.] Graham" "of subjecting plaintiff to an additional day of SHU confinement," Dkt. No. 79 at 12 ¶ 28, fails to establish that Supt. Graham, by his "own individual actions," violated plaintiff's First Amendment rights.  Tangreti, 983 F.3d at 616.  Indeed, defendants' admissible evidence establishes that Supt. Graham was not involved in the decision to keep plaintiff in his SHU cell for an additional day, or in the decision to add plaintiff to the call-out list for the 2015 Transfiguration Day service, as such decisions were the responsibility of the Deputy of Security at Auburn C.F.  See Dkt. No. 59-10 at 3 ¶ 10; ¶¶ 15, 17, 18.  In any event, defendants have established that plaintiff was not moved to general population on October 30, 2015, because "there was no general population cell available for [plaintiff], and he could not be safely and securely moved to general population until October 31, 2015."  Id. at 3 ¶ 13.  Moreover, insofar as plaintiff alleges that he sent a letter to Supt. Graham to inform him that his disciplinary sanctions expired on October 30, 2015, and/or requesting to be placed on a religious call-out list, Supt. Graham denies receiving any such letter.  See id. at 3 ¶ 18.  In any event, the receipt of a letter, without more, is insufficient to establish personal involvement for purposes of Section 1983 liability even under the now-invalid Colon standard.  See Jones v. Fischer, No. 9:11-CV-774 (GLS/CFH), 2013 WL 4039377, at *10 (N.D.N.Y.

Aug. 7, 2013) ("[R]eceipt of a letter    . . ., without personally investigating or acting on [it], is insufficient to establish personal involvement."); Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *16 (N.D.N.Y. Jan. 24, 2013) ("[M]ere receipt of a report or complaint or request for an investigation . . . is insufficient to hold the official liable for the alleged constitutional violations."), report and recommendation adopted, No. 9:11-CV-186 (NAM/TWD), 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013); Walker v. Pataro, No. 99-CV-4607(GBD/AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.").

As a final matter, Supt. Graham denies directing instructing any Auburn C.F. personnel to identify plaintiff as a Jewish inmate. See Dkt. No. 59-10 at ¶ 14. Plaintiff's conclusory assertions in opposition fail to raise a triable issue of fact. See Batista v. Union of Needleworkers, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the] defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Accordingly, it is recommended that plaintiff's First Amendment claims relating to the 2015 Transfiguration Day celebration be dismissed insofar as asserted against Supt. Graham for lack of personal involvement.

**b. First Amendment Free Exercise Clause Claims against C.O. Delfavero and C.O. Venditti Relating to the 2015 Transfiguration Day Celebration**

The First Amendment to the United States Constitution guarantees the right to free exercise of religion.  See U.S. CONST. amend. I; Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors.  See Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).  Thus, for example, under accepted free exercise jurisprudence, inmates are guaranteed the right to participate in congregate religious services under most circumstances.  See, e.g., Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Salahuddin, 993 F.2d at 308.  For example, a determination of whether an inmate's constitutional rights have been infringed by the refusal to permit his attendance at a religious service hinges upon the balancing of the inmate's First Amendment free exercise right against the institutional needs of officials tasked with the increasingly daunting task of operating prison facilities.  This determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right . . . is 'reasonably related to legitimate penological interests.' " Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.1990) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

A prisoner bringing a free exercise claim has the initial burden of establishing "that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274-75.  The burden then shifts to the defendants to identify legitimate penological interests which justify the restriction of the plaintiff's free exercise rights.  See id. at 275.  The burden on the defendants in this situation is "relatively limited" and the burden remains on the plaintiff to establish that the identified penological interests are irrational or illegitimate.  Id.; see Ford, 352 F.3d at 595.

The court must then determine if the challenged regulation or decision is reasonable based on the following four factors:

> [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Salahuddin, 467 F.3d at 274 (citing Turner, 482 U.S. at 90-91) (footnote omitted).  As the Second Circuit made clear in Salahuddin, "[t]he first . . . 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed by rather an essential requirement."  Id. (citations omitted).

The undersigned concludes that genuine questions of fact preclude summary judgment as to plaintiff's Free Exercise Clause claim against C.O.s Delfavero and Venditti.  As an initial matter, defendants do not dispute the sincerity of plaintiff's religious beliefs, and the documentary evidence establishes that he was placed on the roster of Rastafari inmates prior to arriving at Auburn C.F.  See Dkt. No. 79-1 at 18.

39

As defendants' documentary evidence establishes, Transfiguration Day was included on the 2015 DOCCS Religious Holy Day Calendar as a Rastafarian Holy Day to be observed on November 2, 2015.  See Dkt. No. 59-14 at 32.  Defendants do not dispute plaintiff's characterization of Transfiguration Day as being "the highest of all [of the Rastafarian] holy days."  Dkt. No. 59-11 at 58.  Defendants also do not controvert that plaintiff did not attend the 2015 Transfiguration Day service or receive the sacramental meal.  "The Second Circuit has held that denying an inmate the opportunity to attend one service that is 'central or important' to his religion, such as a holy day observance, without a legitimate reason violates his clearly established First Amendment rights." Cantey v. Martuscello, No. 9:17-CV-0284 (LEK/CFH), 2019 WL 1397006, at *8 (N.D.N.Y. Mar. 28, 2019) (quoting Ford, 352 F.3d at 593), modified in part on reconsideration, No. 9:17-CV-284 (LEK/CFH), 2020 WL 1030646 (N.D.N.Y. Mar. 3, 2020), appeal dismissed sub nom. Cantey v. Reddie, No. 20-855, 2020 WL 8837119 (2d Cir. Nov. 20, 2020).  Similarly, courts in this circuit have held that the "denial of a single religious meal can violate an inmate's constitutional rights if it occurs on a significant religious holiday."  Shepherd v. Fisher, No. 08-CV-9297 (RA), 2017 WL 666213, at *34 (S.D.N.Y. Feb. 16, 2017).  Thus, the undersigned concludes that causing plaintiff to miss the Transfiguration Day service and the accompanying sacramental meal substantially burdened plaintiff's sincerely held religious beliefs.

The undersigned must next assess whether defendants have satisfied their burden of identifying legitimate penological interests in denying plaintiff's request to attend the 2015 Transfiguration Day service and to be provided with the sacramental meal.  See Salahuddin, 467 F.3d at 275.  In response to plaintiff's contention that Capt.

Diego gave him oral permission to attend the 2015 Transfiguration Day service, defendants point out that the 2015 DOCCS Religious Holy Day Calendar stated that inmates "must submit a written request to participate in the religious programs that they are interested in."  Dkt. No. 59-10 at 18.  However, Sgt. White's memorandum also indicated that, although there was "no knowledge of [plaintiff] attempting to request to be added on the callout for Transfiguration Day or attempt to contact a Chaplain," plaintiff "could have easily asked the Block Officer to contact [Sgt. White] to confirm his religious practice and [Sgt. White] could have made the necessary provisions."  Id. Neither Sgt. White's memorandum nor any of defendants' evidence explains what "necessary provisions" would have been made, and raises a question of fact as to whether an oral request could have permitted plaintiff to attend the 2015 Transfiguration Day service, or at least allowed plaintiff to set in motion the process for obtaining the required written approval.  Id.  Further, defendants' reliance on Inmate Disciplinary Rule 109.10 in this regard is unpersuasive.  Inmate Disciplinary Rule 109.10 states only that "[a]n inmate shall not be out of place in any area of the facility."  7 N.Y. COMP. CODES R. & REGS. § 270.2(10)(i).  Of course, not allowing inmates to roam outside of their cells without being properly accounted for is a legitimate penological interest, but defendants have not addressed or submitted evidence to establish how or why they could not have properly accounted for plaintiff by affording him written approval and adding him to a call-out after he verbally requested to attend the Transfiguration Day service, which Sgt. White's memorandum suggests may have been a viable way of obtaining the required approval.

Moreover, neither C.O. Delfavero nor C.O. Venditti address plaintiff's contention that he requested them to call the Chaplain's office to confirm that he was not Jewish and could attend the Transfiguration Day service; rather, C.O. Delfavero and C.O. Venditti only deny calling plaintiff Jewish and state that they were not responsible for creating or maintaining religious call-out lists.  See Amen. Compl. at 19 ¶ 89; Dkt. No. 59-13 at 2, 4 ¶¶ 10, 18; Dkt. No. 59-14 at 2, 4 ¶¶ 10, 18.  However, neither C.O. Delfavero nor C.O. Venditti could recall the November 2, 2015 events relating to plaintiff either in their declarations in support of summary judgment or when interviewed by Sgt. White sometime in early 2016.  See Dkt. No. 59-13 at 3-4 ¶¶ 17, 18; Dkt. No. 59-14 at 2 ¶ 12; Dkt. No. 79 at 18.  In addition, although acknowledging the rarity of such an occurrence, neither C.O. Delfavero nor C.O. Venditti indicate that an inmate is precluded from obtaining permission from attending a religious service on the same day of the service.  See Dkt. No, 59-13 at 3 ¶ 13; Dkt. No. 59-14 at 3 ¶ 14.  Thus, the undersigned concludes that defendants have failed to meet their burden of identifying a legitimate penological interest to justify preventing plaintiff from attending the 2015 Transfiguration Day service and accompanying sacramental meal.  Consequently, it is recommended that defendants' motion for summary judgment be denied as to plaintiff's First Amendment Free Exercise Clause claims against C.O. Delfavero and C.O. Venditti.

### c. Fourteenth Amendment Equal Protection: Call-Out List for 2015 Transfiguration Day Service and Sacramental Meal

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  U.S. CONST. amend. XIV, § 1.  Essential to that protection is

the guarantee that similarly-situated persons be treated equally.  See <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985).  "To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005).

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

<u>Vegas v. Artus</u>, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  To succeed, a plaintiff must show "that [he was] intentionally treated differently from other similarly-situated individuals without any rational basis."  <u>Clubside, Inc. v. Valentin</u>, 468 F.3d 144, 158-59 (2d Cir. 2006); <u>see</u> <u>Ramsey v. Goord</u>, 661 F. Supp. 2d 370, 397 (W.D.N.Y. 2009) ("Establishment of an equal protection violation requires the plaintiff show purposeful discrimination directed at an identifiable suspect class." (internal quotation marks and citation omitted)).

Here, the record is devoid of admissible evidence to support plaintiff's claim that defendants acted intentionally or purposefully to discriminate against him based on his religious beliefs by failing to put him on a call-out list.  <u>See</u> <u>Reynolds v. Barrett</u>, 685 F.3d 193, 201 (2d Cir. 2012) ("'[A] plaintiff pursuing a claimed . . . denial of equal protection under § 1983 must show that the discrimination was intentional.'" (quoting <u>Patterson v. Cnty. of Oneida</u>, 375 F.3d 206, 226 (2d Cir. 2004)).   Further, aside from plaintiff's conclusory assertion made in opposition that defendants "purposefully act[ed] with

malice," see Dkt. No. 79 at 10, the record is bereft of any evidence that supports plaintiff's speculative assertion that inmates of other religions were placed on call-out lists. See Amen. Compl. at 17 ¶ 74. Consequently, it is recommended that plaintiff's Fourteenth Amendment Equal Protection claim premised on the 2015 Transfiguration Day service be dismissed as without merit.

### 2. December 27, 2015 and February 14, 2016 Rastafarian Services

Defendants contend that, to the extent that the December 27, 2015 Rastafarian service December was cut short, it was due to security threats at Auburn C.F. the previous day that delayed the breakfast meal and cut into religious call-out times. See Dkt. No. 60 at 15. In his declaration, Supt. Graham states that, on December 27, 2015, "there was threat to the safety and security of the facility[,]" consisting of inmate-on-inmate assaults. Dkt. No. 59-10 at 8 ¶ 41. Supt. Graham explains that, when "there were multiple inmate assaults on inmates on a particular day, the facility would slow the morning process of the following day to determine if there is a trend of assault." Id. Therefore, due to numerous inmate-on-inmate assaults that occurred on December 26, 2015, the December 27, 2015 "breakfast meal ran approximately one hour longer than normal . . . ." Id. at ¶ 42. Attached to Supt. Graham's declaration is the logbook of the watch commander from December 26, 2015, indicating that several inmate-on-inmate fights occurred. See id. at 150-53. Supt. Graham continues that, all call-outs end at 10:30 a.m. to allow inmates to return to their cells by 11:00 a.m. for the master count, which "ensure that all inmates are presented and accounted for in the facility." Id. at 8-9 ¶ 42. Moreover, Supt. Graham notes that "[t]here is no time limit or time entitlement for

44

any faith group." Id. at ¶ 42.  Therefore, Supt. Graham states, "[t]o the extent another religion may have participated in a longer service call-out on such day, it would have been because the rest of the date was not interrupted with incident."  Id. at 9 ¶ 32. Concerning the February 14, 2016 Rastafari service, Supt. Graham states that he "did not and would not have determined how many inmates could have gone into religious services at one time . . . ."  Id. at ¶ 47.  He also declares that he is "unaware of a situation . . . that another religion was treated differently or unequally to Rastafari inmates . . . ."  Id. at 9-10 a ¶ 47.

In opposition, plaintiff reasserts his contention that Supt. Graham cut short the Rastafarian service on December 27, 2015, while allowing inmates of other religious denominations to participate in much longer worship services.  See Dkt. No. 79 at 13-16.  With respect to the February 14, 2016 Rastafari service, plaintiff posits that the unequal treatment of Rastafari inmates was due to "systemic bias against plaintiff and the Rastafari."  Id. at 16 ¶ 38.[6]

### a. Free Exercise Claims

In contrast to holy days of special significance, see Ford, 352 F.3d at 593, courts in the Second Circuit have routinely held that missing one or two religious prayer services does not constitute a substantial burden necessary to sustain a First Amendment infringement claim.  See Lopez v. Cipolini, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015) (Holding that the plaintiff failed to plausibly allege a First Amendment

---

[6]  Plaintiff also asserts new arguments relating to the dismissed Doe defendants and posits that "security camera footage" supports his arguments, which the undersigned declines to address.  Dkt. No. 79 at 16 ¶ 39.

Free Exercise Clause claim where she "only claim[ed] that she missed two religious services [i]n February . . . 2014 . . . and  . . . d[id] not allege that the specific services were central or important to [her] faith." (internal quotation marks and citation omitted). see also Jean–Laurent v. Los, No. 12-CV-132S(F) (WMS), 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 8, 2015) ("Courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion."); Blalock v. Jacobsen, No. 13-CV-8332 (JMF), 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) ("[T]he denial of two religious services . . . does not substantially burden an inmate's right to religious observation."); Shapiro v. Community First Services, Inc., No. 11-CV-4061 (KAM/LB), 2014 WL 1276479, at *11 (E.D.N.Y. Mar. 27, 2014) ("[N]ot permitting a prisoner to attend two religious services 'is a de minimis, or insubstantial, burden on an inmate's ability to freely exercise his religion.'"); Hankins v. N.Y. State Dep't of Corr. Servs., No. 9:07-CV-0408 (FJS/GHL), 2008 WL 2019655, at *5 (N.D.N.Y. Mar. 10, 2008) ("[A]n allegation that prison officials caused a prisoner to miss one religious service fails to state an actionable claim under the First Amendment.") (footnote omitted).  Thus, even accepting plaintiff's allegations as true and drawing all inferences in his favor, plaintiff cannot establish that his First Amendment rights were substantially burdened by missing two prayer services on December 27, 2015, and February 14, 2016.  Consequently, it is recommended that plaintiff's First Amendment Free Exercise claims against Supt. Graham based on the December 27, 2015 and February 14, 2016 Rastafarian services be dismissed as meritless.

### b. Fourteenth Amendment Equal Protection Claims

Plaintiff's Equal Protection claims against Supt. Graham concerning the December 27, 2015 and February 14, 2016 Rastafari services are speculative and unsupported by any evidence from which the undersigned can infer discriminatory animus or intent.  See Reynolds, 685 F.3d at 201.  Further, defendants' admissible evidence establishes that Supt. Graham—the only defendant against whom these claims are asserted—did not discriminatorily limit Rastafarian services in either time or number of adherents allowed to worship.  See Dkt. No. 59-10 at 8, 9 ¶¶ 43, 47.  Rather, the December 27, 2015 service was cut short, if at all, due to legitimate security concerns and "[t]o the extent another religion may have participated in a longer service call-out on such day, it would have been because the rest of the date was not interrupted with incident."  Id. at 9 ¶ 32.  Plaintiff's self-serving and conclusory allegations in opposition—which are completely unsupported by any record evidence— fail to raise a genuine issue of material fact.  See Scott, 344 F.3d at 287; Batista, 2000 WL 1760923, at *3.  Consequently, it is recommended that plaintiff's Equal Protection claims against Supt. Graham concerning the December 27, 2015 and February 14, 2016 Rastafari services be dismissed.

### 3. Threats of SHU Confinement[7]

Defendants argue that neither Supt. Graham nor Sgt. Porten threatened plaintiff with SHU confinement for his participation at Rastafari worship services.  See Dkt. No.

---

[7]  Both parties' briefs refer to the allegations of SHU confinement threats as stemming from incidents in "December 2015."  Dkt. No. 59-10 at 100-101; Dkt. No. 60 at 16; Dkt. No. 79 at 18.  However, as addressed herein, plaintiff's allegations and defendants' evidence make clear that these threats stem from occurrences in February 2016.

60 at 16.  Rather, defendants aver, at most, Sgt. Porten and/or other Auburn C.F. personnel warned plaintiff that he could face disciplinary sanctions for preaching at Rastafari services because he was not an approved inmate facilitator.  See id.  In support of their arguments, defendants proffer Supt. Graham's declaration in which he explains that pursuant to DOCCS Directive 4202, only inmates approved by the Superintendent in consultation with the Coordinating Chaplain and Director of the DMFVS are permitted to facilitate religious services during call-outs.  See Dkt. No. 59-10 at 6 ¶¶ 32, 33.  Further, Supt. Graham explains that, at all relevant times to the claims in the Amended Complaint, plaintiff was not an approved inmate facilitator at Auburn C.F.  See id. at 7 ¶ 35.  Moreover, Supt. Graham notes that he denied plaintiff's Grievance No. AUB-68944-16, in which plaintiff complained that Auburn C.F. personnel were interfering with his religious observance.  See id. at 6 ¶ 31.  Supt. Graham reasoned that, contrary to plaintiff's assertions, the grievance investigation revealed, as relevant, that Sgt. Porten had "informed [plaintiff] that only a superintendent approved facilitator can lead the service."  Id. at 89.  Supt. Graham points out that, because inmate religious "[s]ervices are not always monitored by a DOCCS official[,]"  they "must be conducted in an orderly fashion."  Id. at 7 ¶ 34.  In addition, Supt. Graham explains that "[t]he purpose of approving inmate facilitators is to make sure the inmate facilitator . . . conducts services in an orderly manner that does not jeopardize the safety or security of the correctional facility (e.g. using services to . . . create a disturbance at the facility)."  Id.  Supt. Graham denies threatening plaintiff or ordering Sgt. Porten to threaten plaintiff with SHU sanctions.  See id. at 5 ¶¶ 28, 29.

48

Defendants also submit Sgt. Porten's declaration in which he denies threatening plaintiff with SHU sanctions, either on his own or under orders from Supt. Graham.  See Dkt. No. 59-12 at 2, 5 ¶¶ 6, 19, 20.  Further, Sgt. Porten explains that, in June 2016, nonparty Lt. Ouimette ordered him to investigate plaintiff's Grievance No. AUB-68944-16.  See id. at ¶ 7.  Sgt. Porten states that he interviewed plaintiff and informed him that only superintendent-approved inmate facilitators were allowed to lead religious services.  See id. at 3 ¶ 10.  He also indicates that plaintiff "did not deny that he was attempting to lead services without approval on the dates in question."  Id. at ¶ 11.  Sgt. Porten states that he interviewed plaintiff's only witness, inmate Morris, who indicated that Rastafari call-outs were running smoothly.  See id. at 2 ¶ 9.  Sgt. Porten denies falsifying inmate Morris' statements.  See id. at 4 ¶ 16.

In opposition, plaintiff argues that "[w]ithin the Nyahbinghi circle there is no preacher/facilitator" because "Rastafari is an ascendant meritocracy where each voice . . . merits his or her place based on the knowledge of the Rastafari truth[.]"  Dkt. No. 79 at 18 ¶ 44 (emphasis omitted).  Plaintiff also "concedes that . . . he did participate actively in the Sacred Reasoning within the Rastafari Nyahbinghi," but "denies that he was ever observed preaching."  Id. at 19 ¶ 47 (emphasis omitted).  Thus, plaintiff contends, defendants are incorrect that he violated DOCCS regulations by preaching, and that defendants "threatened [him] with SHU time for practicing his Rastafari truth."  Id. at 20 ¶ 48.  Plaintiff posits that defendants' belief that he was preaching is due to their "ignoran[ce]" of the Rastafari religion, and reasserts that defendants' threats inhibited his ability to practice his faith.  Id. at 19 ¶ 45; see id. at 20-21 ¶¶ 49-51.

The undersigned concludes that defendants have proffered admissible evidence establishing that neither Supt. Graham, Sgt. Porten nor any other DOCCS personnel threatened plaintiff that he would be placed in SHU if he participated in Rastafari services.  The declarations of Supt. Graham and Sgt. Porten—made under penalty of perjury—deny that anyone threatened plaintiff in such a manner and demonstrate that, at most, Sgt. Porten and others merely warned plaintiff that, pursuant to Directive 4202, plaintiff was not allowed to lead the Rastafarian services because he was not an approved inmate facilitator.  See Dkt. No. 59-10 at 5 ¶¶ 28, 29, 89; Dkt. No. 59-12 at 2, 3, 5 ¶¶ 6, 10, 19, 20.  Supt. Graham's and Sgt. Porten's declarations are corroborated by C.O. LaMoascolo's March 3, 2018 memorandum, in which he explained that he had counseled plaintiff that, "since he is not a facilitator, he is not allowed to lead the Rastafarian services in any way without being specifically approved per directive" 4020.  Dkt. No. 59-12 at 11.

In his opposition, plaintiff "concedes that . . . he did participate actively in the Sacred Reasoning within the Rastafari Nyahbinghi," Dkt. No. 79 at 19 ¶ 47, and in his Grievance No. AUB-68944-16, plaintiff acknowledges that, during Rastafari call-out, he was "speaking out against . . . anti-human, anti-JAH ideals," including, according to plaintiff,  "homosexuality."  Dkt. No. 59-12 at 19.  It is undisputed that, at all relevant times, plaintiff was not a superintendent-approved inmate coordinator, as required pursuant to Directive 4202.  See id.  Therefore, as defendants posit, plaintiff's admitted conduct of leading a discussion in which he expressed his anti-homosexual view during a Rastafari callout was in violation of Directive 4202, which expressly states that, "ONLY the designated inmate facilitator may teach/present/preach during the callout."  Id. at 94.

50

In addition, although not noted by defense counsel's cursory brief, Directive 4202 also explicitly provides that "Inmate Facilitators MUST submit prior to each study class or worship service . . . [t]he 'word for word' speech/homily/sermon to be delivered at the callout."  Id.  Plaintiff, at no time, challenges the validity of Directive 4202, and does not aver that he submitted his anti-homosexual speech for approval prior to the call-out; consequently, his speech was not within "the ONLY acceptable format" or within the "guidelines for conducting religious programming[.]"  Id.

Moreover, defendants have established a legitimate penological interest in curtailing unfettered inmate speech during religious call-outs and limiting the ability to lead services during religious call-outs to superintendent-approved inmate facilitators— namely, as Supt. Graham explained, to ensure that "the inmate facilitator . . . conducts services in an orderly manner that does not jeopardize the safety or security of the correctional facility," such as "using [religious] services to . . . create a disturbance at the facility."  Dkt. No. 59-10 at 7 ¶ 34 (parenthesis omitted); see McKinney v. City of New York, No. 19-CV-05320 (AJN/KHP), 2020 WL 5775664, at *6 (S.D.N.Y. July 23, 2020) ("Legitimate penological interests may include prison security and institutional safety goals."), report and recommendation adopted, No. 19-CV-5320 (AJN/KHP), 2020 WL 5775194 (S.D.N.Y. Sept. 28, 2020).  Thus, in advising plaintiff that he was not permitted to lead the Rastafari call-out in violation of Directive 4202 and/or that doing so could result in disciplinary sanctions, defendants were advancing a legitimate penological interest.  In any event, as set forth above, plaintiff failed to properly exhaust these claims.  Consequently, it is recommended that plaintiff's Free Exercise Clause claims

against Supt. Graham and Sgt. Porten based on purported threats of SHU confinement be dismissed.

### 4. First Amendment Claims Relating to Food Preparation and Service

Defendants argue that plaintiff's First Amendment claims relating to homosexuals preparing and/or serving food must be dismissed.  See Dkt. No. 60 at 17.  First, defendants posit that plaintiff's Establishment Clause claim must fail because "[d]efendants' declination to discriminate against inmates in program work assignments based on sexual orientation clearly constitutes a secular purpose that neither advances nor hinders any religion."  Dkt. No. 60 at 18.  Defendants point out that prohibiting inmates from working in food services on the basis of their sexual orientation would violate state and federal anti-discrimination laws.  See id.  In support, defendants proffer the declaration of Annucci, who explains that he is "unaware of any former policy or DOCCS Directive that expressly provided that only Rastafari inmates may serve meals to other Rastafari inmates."  Dkt. No. 59-8 at 2 ¶ 5.  Annucci also states that he is "unaware of any DOCCS policy, or revision to a policy, that specifically promotes the employment of homosexuals in food preparation, handling, or distribution in DOCCS facilities, or that promotes the preparation, service or distribution of meals by homosexual inmates to Rastafari inmates."  Id. at ¶ 6.  Rather, Annucci explains, DOCCS policies are compliant with state and federal anti-discrimination laws and that "DOCCS cannot, and does not, discriminate against any individual in employment based on . . . sexual orientation" and "does not discriminate in the hiring or firing of an inmate for a program work assignment."  Id. at ¶ 7; see id. at ¶ 6.  Moreover, Annucci

states that, at no time "did [he] employ an individual or member of a clergy (i.e.
Rastafari Chaplain such as Stewart or Rose) to create a 'pro homosexual' policy or
custom." Id. at 3 ¶ 10. Annucci also explains that he "would not have hired . . .
Chaplains," such as Steward or Rose, as hiring such personnel is the duty of "the
Director of [DMFVS]." Id. at ¶ 11.

Defendants also proffer the declaration of McKoy, DOCCS Deputy Commissioner
of Program Services, who explains that, in his role he is "responsible for the oversight of
the Department's Program Services." Dkt. No. 59-4 at 2 ¶ 5. McKoy states that, "[i]f
there were any policies written or rewritten regarding [DOCCS'] food preparation,
servicing or handling, [he] would have been involved even if it was simply to review
and/or approve such policies drafted by others within the Department." Id. at 2 ¶ 6.
However, McKoy declares, he is "unaware of any former DOCCS directive that
expressly provided that only Rastafari inmates could prepare or serve daily meals to
other Rastafari inmates"; "unaware of any former DOCCS policy that prohibited . . .
homosexual [inmates] from preparing, serving or distributing food to Rastafari inmates";
and "unaware of any DOCCS policy, or revision thereto, that specifically promotes the
employment of homosexuals in food preparation, handling, or distribution in DOCCS
facilities." Id. at ¶¶ 8, 9, 10. Rather, McMoy states, DOCCS policies, including its
policies relating to the employment of inmates for food service, comply with state and
federal anti-discrimination laws. See id. at 2-3 ¶ 12. McKoy also denies employing any
clergyperson to create a policy or custom that violated the tenets of the Rastafari faith.
See id. at 13.

Further, defendants proffer the declaration of Morris, DOCCS Director of MFVS, who explains that she too is unaware of any former policy that mandated that only Rastafari inmates could serve food to fellow Rastafari inmates, or any policy that prohibited homosexual inmates from serving food to Rastafari inmates. See Dkt. No. 59-7 at 2 ¶ 5. Morris also denies having knowledge of any current DOCCS policy, or revision to DOCCS policy, that promotes homosexual inmates preparing or serving food to Rastafari inmates, and states that DOCCS does not discriminate in its hiring or firing of inmates for program work assignment. See id. at 2, 3 ¶¶ 6, 8. Morris explains that, "[i]nsofar as there was at one time a provision in the Religious Calendar that Rastafarians were required to serve/prepare other Rastafarians holy day meals, this is no longer a requirement." Id. at 7 ¶ 28. Morris declares that, "[a]t no time . . . did [she] employ an individual or member of clergy (i.e. Rastafari Chaplain such as Stewart or Rose) to create a 'pro homosexual' policy or custom." Id. at 8 ¶ 31.

Morris explains that, "[i]nmates who are assigned to work in the mess hall have been . . . cleared by medical staff. Inmates assigned to food service or food handling positions, including Satellite Areas, must be cleared by the Facility Health Service Director" pursuant to DOCCS Directive 4300. Dkt. No. 59-7 at 6 ¶ 21. Morris further explains that "inmates assigned to work in food service areas are instructed in proper hygiene practice," including "proper hand washing techniques." Id. at ¶ 23. In addition, Morris states that "[t]here would unquestionably be a huge burden on staff to ensure that no . . . homosexual . . . inmate . . . prepare . . . or serve any meal to any Rastafarian inmate." Id. at ¶ 25. In addition, Morris notes that, pursuant to DOCCS Directive 4803, inmate program and work assignments are required to "be made without

54

regard to an inmate's . . . sexual orientation . . . ."  Id. at 7 ¶ 27.  Morris also points out

that "[i]t would be against state and federal law and policy to prohibit an inmate . . . from

working in the facility kitchen, food line, or otherwise" based on their sexual orientation.

Id.

Moreover, defendants proffer Guenette's declaration, in which he states that, "[i]n

[his] official capacity as Assistant Director of the Division of Ministerial Services, [he]

was responsible for following policy and protocol, and advising staff of the same."  Dkt.

No. 59-6 at 2 ¶ 5.  However, Guenette explains, he "was not the policy decision maker

in this capacity."  Id.  Therefore, Guenette posits, he "would not have written or rewritten

any DOCCS policy regarding food preparation, service, handling or distribution or a

policy regarding preparation or distribution of food as it relates to the Rastafarian

religion [and] would not have otherwise been personally or directly involved in the

creation of such a policy[.]"  Id. at ¶ 6.  Similarly, Supt. Graham explains that, "[i]n his

official capacity as Superintendent, [he] was not responsible for creating DOCCS policy"

and "would not have written or rewritten any DOCCS policy regarding food preparation,

service or handling."  Dkt. No. 59-10 at 10 ¶¶ 49, 50.  Further, Supt. Graham explains

that Auburn C.F. complies with state and federal anti-discrimination laws, such that it

does not discriminate against individuals for purposes of hiring or firing based on sexual

orientation.  See id. at ¶ 51.

In opposition, plaintiff avers that "defendants openly admit to violating the First

Amendment's Establishment Clause, when they changed the Religious Calendar to

reflect . . . their take over [sic] of Religious doctrine" and retracted DOCCS' prior policy

of allowing only inmates of the same religious faith to serve each other food.  Dkt. No.

79 at 27 ¶ 66; see id. at 28 ¶ 66.  This policy change, plaintiff states, "open[ed] the door for homosexuals," among others, "to handle, prepare and distribute [Rastafari inmates'] meals."  Id. at 28 ¶ 66.

### a. Personal Involvement

As an initial matter, the declarations of Annucci, Guenette, and Graham establish that those defendants did not create, alter, and/or promulgate DOCCS policy insofar as it relates to food preparation or service.  See Dkt. No. 59-8 at 3 ¶¶ 10, 11; Dkt. No. 59-6 at 2 ¶¶ 5, 6; Dkt. No. 59-10 at 10 ¶¶ 49, 50.  Thus, plaintiff cannot establish that the "individual actions" of any of these defendants caused the alleged constitutional violations.  Tangreti, 983 F.3d at 616.  To the extent that plaintiff attempts to premise his claims in this regard against Annucci, Guenette, and Graham based solely on their positions of authority, plaintiff fails to establish their personal involvement, as holding a high-ranking position in the New York prison hierarchy, without more, is insufficient to establish personal involvement.  See Black, 76 F.3d at 74.  Thus, it is recommended that plaintiff's Establishment Clause and Free Exercise Clause claims based on the purported policy of allowing homosexual inmates to serve plaintiff food be dismissed for lack of personal involvement insofar as asserted against Annucci, Guenette, and Graham.

### b. Establishment Clause Claims Against McKoy and Morris

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  The

Establishment Clause ensures that the government does not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion." Muhammad v. City of New York Dep't of Corrs., 904 F. Supp. 161, 197 (S.D.N.Y. 1995) (internal quotation marks, brackets, and citation omitted). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir. 2006) (internal quotation marks and citation omitted). In Lemon v. Kurtzman, the United States Supreme Court set forth a test to assess whether a government practice satisfies the Establishment Clause. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, reh'g denied 404 U.S. 876 (1971). "The Lemon test requires the Court to consider: (1) whether the government action in question has a secular purpose; (2) whether the primary effect of the action, as seen by a reasonable observer, 'neither advances nor inhibits religion,' and (3) whether the action fosters 'excessive government entanglement with religion.'" Lewis v. Zon, 920 F. Supp. 2d 379, 386 (W.D.N.Y. 2013) (quoting Lemon, 403 U.S. at 612-13). However, "as with the Free Exercise Clause, prison officials are permitted to 'make [] difficult judgments concerning institutional operations,' as stricter scrutiny would 'seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'" Powlette v. Morris, No. 13-CV-7378 (KPF), 2016 WL 3017396, at *8 (S.D.N.Y. May 23, 2016) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

Here, defendants have established, through admissible evidence, entitlement to summary judgment as to plaintiff's Establishment Clause claim. Defendants' admissible documentary evidence demonstrates that Morris did not employ chaplains to "create a

'pro homosexual' policy or custom," Dkt. No. 59-7 at 8 ¶ 31, and McKoy did not review

or approve such a policy.  See Dkt. No. 59-4 at 2 ¶¶ 6-10.  Morris's and McKoy's

declarations establish that, during the times relevant to plaintiff's claims, they are both

"unaware of any former DOCCS directive that expressly provided that only Rastafari

inmates could prepare or serve daily meals to other Rastafari inmates"; "unaware of any

former DOCCS policy that prohibited . . . homosexual [inmates] from preparing, serving

or distributing food to Rastafari inmates"; and "unaware of any DOCCS policy, or

revision thereto, that specifically promotes the employment of homosexuals in food

preparation, handling, or distribution in DOCCS facilities."  Dkt. No. 59-4 at ¶¶ 8, 9, 10;

see Dkt. No. 59-7 at 5 ¶ 15.  Moreover, as Morris explained in her declaration, although

there " was at one time a provision in the Religious Calendar that Rastafarians were

required to serve/prepare other Rastafarians holy day meals, this is no longer a

requirement."  Dkt. No. 59-7 at 7 ¶ 28.  However, this former policy concerning

Rastafarian holy day meals is of no moment to plaintiff's present contentions because,

as he made clear during his deposition, plaintiff's primary complaint about one instance

of receiving food from an inmate whom he assumed identified as homosexual, was

related to his diet/medical meal—not a meal provided on a religious holy day.  See Dkt.

No. 59-11 at 119.

Further, defendants have established that, insofar as plaintiff's allegations may

be read as challenging DOCCS Directive 4803 as "pro homosexual," his claims are

meritless.  As Morris explained, DOCCS Directive 4803, which governs decisions

concerning the hiring of inmates for program and work assignments, requires that such

decision "be made without regard to an inmate's . . . sexual orientation . . . ."  Dkt. No.

59-7 at 7 ¶ 27.  As defendants aver, and plaintiff fails to proffer any evidence to refute,

DOCCS Directive 4803 is non-secular—indeed, the Directive encompasses DOCCS'

antidiscrimination policy that prevents hiring and firing decisions for inmate employees

on the basis of sexual orientation, as is required under applicable federal and state law.

See Dkt. No. 60 at 18; see also Bostock v. Clayton Cty., Georgia, , ____ U.S. ____ ,140

S. Ct. 1731, 1737 (2020) (holding that employment discrimination on the basis of sexual

orientation is actionable under Title VII of the Civil Rights Act of 1964); N.Y. Exec. Law §

296(1)(a) ("It shall be an unlawful discriminatory practice . . . [f]or an employer . . .

because of an individual's . . . sexual orientation . . . to refuse to hire or employ or to bar

or to discharge from employment such individual or to discriminate against such

individual in compensation or in terms, conditions or privileges of employment.").

Next, the Supreme Court has instructed that for a policy to violate the second

factor of the Lemon test, "the challenged governmental action must have 'a *direct and*

*immediate* effect of advancing religion.'"  Boyd v. Coughlin, 914 F. Supp. 828, 832

(N.D.N.Y. 1996) (McAvoy, J.) (quoting Comm. For Pub. Ed. & Religious Liberty v.

Nyquist, 413 U.S. 756, 783 n. 39 (1973)).  "[W]hen distilled to some manageable

articulation, the court must determine whether the challenged governmental conduct,

when viewed in context, is likely to be perceived as having as its principal or primary

purpose the endorsement or disapproval of religion."  Boyd, 914 F. Supp. at 832.  Here,

plaintiff cannot seriously contend that DOCCS Directive 4803—a prison policy that

embodies applicable federal and state anti-discrimination law—would likely be

perceived as endorsing or disapproving religion.

Finally, with respect to the third <u>Lemon</u> factor, whether the challenged governmental action causes excessive government entanglement with religion, the undersigned finds unpersuasive plaintiff's argument that DOCCS' anti-discrimination policy compels or coerces plaintiff to endorse homosexuality against his religious beliefs.  Plaintiff's entire theory in this regard is premised on the fact that, one time when he went to pick up his diet meal, an inmate, who he describes as "a homosexual dude, I don't know—I don't know what they define themselves as, but he a homosexual with all—with titties and all that serv[ed him his] diet meat."  Dkt. No. 59-11 at 119.  The fact that DOCCS refuses—as required by law—to prohibit inmates from serving food based on their sexual orientation, which caused plaintiff, on one occasion, to be served by an inmate whom he perceived to be homosexual, does not constitute excessive government entanglement with religion.

Moreover, insofar as plaintiff contends that by complying with applicable anti-discrimination laws DOCCS is promoting homosexuality or homosexual inmates working in the Auburn C.F. mess hall, he is simply mistaken.  Indeed, simply because plaintiff finds homosexuality repugnant, does not mean that a facility's anti-discrimination policy that prohibits DOCCS from excluding inmates from employment opportunities based on their sexual orientation in any way coerces or compels him to endorse or accept "the state's homosexual construct," whatever that means.  Dkt. No. at 49 ¶ 13.  As an additional practical matter, as Morris aptly points out in her declaration, "[t]here would unquestionably be a huge burden on staff to ensure that no  . . . homosexual . . . inmate . . . prepare . . . or serve any meal to any Rastafarian inmate."

Dkt. No. 59-7 at 6 ¶ 25.  Consequently, it is recommended that plaintiff's Establishment Clause claim be dismissed as meritless.

### c. Free Exercise Clause Claims Against McKoy, Morris, and Bertonica

Defendants assert that "[p]laintiff cannot demonstrate that his religion was substantially burdened by homosexuals preparing or serving his meals."  Dkt. No. 60 at 18.  Further, defendants contend that plaintiff was provided with all meals, including those necessary for his therapeutic diet and in accordance with his Rastafari faith and served by properly trained and medically cleared inmates.  See id.  Moreover, defendants argue that, because DOCCS cannot discriminate on the basis of sexual orientation, a legitimate penological reason exists for allowing homosexual inmates to serve food at Auburn C.F.  Id. at 18.  In addition to the evidence proffered, as set forth in subsection III. C. 4., supra, defendants also proffer the declaration of Bertonica, who at all relevant times, was employed as Auburn C.F.'s Food Service Administrator,  in support of their arguments for dismissing plaintiff's Free Exercise Clause claim premised on purported homosexual inmates serving food. See Dkt. No. 59-2 at 1 ¶ 1. Bertonica reiterates that "[p]rogram assignments, including food preparation or meal service, are made without regard to an inmate's sexual orientation."  Id. 59-2 at 1 ¶ 3. Bertonica explains that that he has "never been advised by DOCCS officials that having homosexuals serve meals to inmates of the Rastafari faith would violate an inmate's religious rights or beliefs."  Id.

In opposition, plaintiff reasserts that, due to defendants' policy of allowing homosexual inmates to serve him food, he was faced with a "Hobson's choice."  Dkt.

No. 79 at 21 ¶ 54.  Plaintiff now adds that he was forced to "consum[e] food he understood to have been made unclean by the morally unnatural homosexual practice of the inmate serving it."  Id. at 22 ¶ 55.  Plaintiff cites Leviticus 20:13 in support of his position that homosexuality is "'an abomination.'"  Id. at ¶ 56 (quoting Leviticus 20:13). Plaintiff then explains that, "while there maybe [sic] no scripture that prohibits homosexuals from preparing food for consumption by those pseudo alternative life-style Rastafarians DOCCS religious committee seeks to create[,]" the reference to "corruption in Corinthians 15:50 represents a "scriptural admonishment of homosexuality being an unclean practice" that is part of the Rastafari ecclesiastical law.  Id. at 23 ¶ 59 (quoting Corinthians 15:50).  Plaintiff also proffers what appears to be self-reproduced excerpts from a chapter of a book titled, "Book of Coming Forth by Day" by E.A. Wallis Budge. See Dkt. No. 79-2 at 28.  Under the subheading, "Rastafari know the Forty-two Authentications of Innocence Before JAH[,]" in chapter one, "The Sebat (Seven) Eminences of Ascension," plaintiff's submission states: "I will NOT betray the sacred Balance MA'AT [Justice] and the generative LAW-OF-GENDER, and its Life Giving Equation: Woman + Man = Child."  Id. at 21, 25.  Moreover, plaintiff testified at deposition that the Rastafari faith "doesn't include anything to do with any homosexuality, period" and that it is part of [his] tenets [that he is] not allowed to basically say[,] associate[,] . . . fraternize[,] or eat from or eat food prepared by people who are homosexual."  Dkt. No. 59-11 at 74, 119.

A court's assessment of a prisoner's religious beliefs "extends only to whether a [prisoner] sincerely holds a particular belief and whether the belief is religious in nature." Ford, 352 F.3d at 590 (internal quotation marks and citation omitted); see Jackson v.

Mann, 196 F.3d 316, 320 (2d Cir. 1999) ("[T]he relevant inquiry is not whether, as an objective matter, the belief is accurate or logical.  Instead, the inquiry is whether the beliefs . . . are *sincerely held* and whether they are, in [the prisoner's] own scheme of things, religious."  (internal quotation marks and citation omitted)).  The Second Circuit has articulated that the use of a subjective test to determine the sincerity of religious beliefs is appropriate because an objective test "would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be."  Jolly v. Coughlin, 76 F.3d 468, 476 (2d Cir. 1996).  Indeed, even "[t]he opinions of . . . religious authorities cannot trump the [prisoner's] sincere and religious belief."  Ford, 352 F.3d at 590.  "Despite the subjective nature of the inquiry, the substantial burden test 'presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis.'"  Casey v. Pallito, No. 5:12-CV-284 (CR), 2013 WL 6673623, at *19 (D. Vt. Dec. 18, 2013) (quoting Ford, 352 F.3d at 593).  The Supreme Court has provided a further limiting principle to the notion of a substantial burden, which recognizes that "[o]ne can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection . . . ."  Thomas v. Review Bd. of Indiana Emp't Sec. Div., 450 U.S. 707, 715 (1981).

The undersigned concludes that this case presents an instance in which the "'belief or practice [at issue] is so peripheral to . . . plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis.'"  Casey, 2013 WL 6673623, at

*19 (quoting Ford, 352 F.3d at 593).  Although the parties do not cite, and the undersigned is not aware of, a case directly on point, the undersigned finds this Court's decision in Livingston v. Griffin, No. 9:04-CV-00607 (JKS), 2007 WL 1500382 (N.D.N.Y. May 21, 2007)) to be instructive.  In Livingston, the inmate asserted that being "handcuffed or, alternatively, forced to sit next to a homosexual/transsexual on a bus would substantially burden [his] religious beliefs."  Livingston, 2007 WL 1500382, at *16. In relevant part, the Court concluded that the plaintiff's claim was distinguishable from cases in which an inmate's claims "r[ose] to the level of . . . cases in which a substantial burden on religious tenets was found to exists."  Id.  For instance, the Court pointed out that the "[p]laintiff was not denied the right to participate in congregate services; [the] right to participate in a religious ceremony of his choice . . . ; or forced to swear on a bible in church."  Id. (internal citations omitted).  The Court reasoned that, instead, "the [p]laintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination. This fits within those cases in which it can comfortably be said that is so peripheral to [a p]laintiff's religion that the burden is constitutionally *de minimis*."  Id. (citing Ford, 352 F.2d at 593).  Significantly, the Court explained,

> nowhere has it been clearly established that no matter how
> strongly or sincerely held his religious beliefs may be, a
> prison inmate has the right to be free from being in the
> proximity of or interactive with another person because of
> that person's sexual orientation.  Indeed, such a rule, just as
> one founded upon color, creed, religious beliefs, gender, or
> national origin, would be repugnant to the strong public
> policy of this country and this Court declines to adopt such a
> rule.

Id.

First, as in Livingston, plaintiff's claim that allowing homosexual inmates to serve him food in a prison mess hall establishes, at most, a *de minimis* burden on his ability to

freely exercise his religion as it amounts only to plaintiff's disagreement or discomfort with persons whom he finds to be "morally unnatural."  Dkt. No. 79 at 22 ¶ 55;  see Livingston, 2007 WL 1500382, at *16; Casey, 2013 WL 6673623, at *19 (quoting Ford, 352 F.3d at 593).  Further, as the Court concluded in Livingston, plaintiff—as a prison inmate—has no right to choose the sexual orientation of the individuals who are employed in food serves jobs and/or prepare or serve him his food in a DOCCS facility. See Livingston, 2007 WL 1500382, at *16.  Moreover, as the Court in Livingston aptly articulated, and defendants have established through their admissible evidence, allowing DOCCS to discriminate against certain individuals in such a manner would violate federal and state anti-discrimination laws, and "would be repugnant to the strong public policy of this country . . . ."  Id.; see Dkt. No. 59-4 at 2-3 ¶ 12; Dkt. No. 59-7 at 2, 3, 7 ¶¶ 6, 8, 27; Dkt. No. 59-8 at 2 ¶¶ 6,7; Dkt. No. 59-10 at 10 ¶ 51.  Thus, as in Livingston, the undersigned declines to adopt such a discriminatory rule.  Consequently, it is recommended that plaintiff's Free Exercise Clause claims be dismissed insofar as asserted against McKoy, Morris, and Bertonica as without merit.

### 5. First Amendment Retaliation Claims

        To establish a claim a First Amendment retaliation claim under Section 1983, a prisoner must demonstrate that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action."  Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted).    Because of the potential for abuse and the "ease with which claims of

retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)). "Finally, even if [a p]laintiff makes the appropriate showing, [the] defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Vega v. Artus, 610 F. Supp. 2d 185, 206 (N.D.N.Y. 2009) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

### a. Bertonica

Defendants aver that plaintiff's First Amendment retaliation claim against Bertonica must be dismissed as meritless. See Dkt. No. 60 at 17. Defendants proffer Bertonica's declaration who states that, in addition to religious meals, "[i]nmates are also offered medical or therapeutic diets." Dkt. No. 59-2 at 1 ¶ 5. Further, Bertonica states that, based on his review of DOCCS records, "in October 2015, [plaintiff] was on a medical or therapeutic diet." Id. at 2 ¶ 7. "Accordingly," Bertonica explains, plaintiff "was required to sign a Therapeutic Diet Meal Attendance Agreement." Id. Attached as an exhibit to Bertonica's declaration is a copy of plaintiff's Therapeutic Diet Meal Attendance Agreement. See id. at 6. As relevant, that document notified plaintiff that "Meal attendance for the therapeutic diet [wa]s mandatory and w[ould] be monitored." Id. at 2 ¶ 7 (quoting id. at 6) (capitalization omitted). The document also informed plaintiff that "if [he was] found to be non-compliant or miss more than 3 of the diet meals per week [he] may receive any or all of the following: counseling, removal from the diet meals program, and/or disciplinary action." Id. (quoting id. at 6). Plaintiff's meal

attendance form indicates that he was placed on an "[e]nhanced fiber, low fat/cholesterol/sodium" diet.  Id. at 6.  Plaintiff signed the meal attendance form on October 26, 2015.  See id.  In addition, Bertonica notes that, "upon entry or reception into DOCCS custody," inmates are advised "that they cannot waste or skip meals."  Id. at 2 ¶ 9 (citing 7 NYCRR § 270.2(B)(25)).

On October 19, 2017, when Bertonica learned that plaintiff "was refusing to eat his meals" and violating his Therapeutic Diet Meals Attendance Agreement, he issued plaintiff a misbehavior report.  See Dkt. No. 59-2 at 3 ¶ 10.  The misbehavior report is attached as an exhibit to Bertonica's declaration, and indicates that Bertonica charged plaintiff with violating the following inmate rules: for 124.13 (inmates shall attend all mandatory meals designated by facility policy), 124.15 (inmates shall not waste food items), and 109.10 (inmates shall not be out of place).  See id. at 9.  The misbehavior report also indicates that plaintiff missed 12 meals between October 9, 2017, and October 13, 2017.  See id.  At the ensuing disciplinary proceeding plaintiff was found guilty of all counts.  See id. at 8.  Bertonica denies plaintiff's allegation that this misbehavior report was false.  See id. at 3 ¶ 13.  Moreover, Bertonica reiterates that DOCCS prohibits discriminating against inmates who may work as serves in the mess hall, and denies that he ever "force[d plaintiff] to consume food prepared or served by a homosexual individual in order to violate his religious rights or for any other unlawful reason."  Id. at 3, 4 ¶¶ 14, 16.  Bertonica posits that he issued plaintiff the misbehavior report "to ensure [his] health and welfare," as plaintiff's refusal to eat meals was "detrimental to his health and welfare."  Id. at 3, 4 ¶¶ 11, 17.

In opposition, plaintiff reasserts the claims in his Amended Complaint against Bertonica.  See Dkt. No. 79 at 31-32 ¶¶ 78-83; Dkt. No. 79-1 at 35.  Plaintiff states that "DOCCS Directives[] do not supersede [his] . . . constitutionally guaranteed rights to Free Exercise of his sincerely held Rastafari Truth[.]"  Id. at 32 ¶ 82.

As to the first element of plaintiff's First Amendment retaliation claim against Bertonica, insofar as plaintiff wrote two letters in October 2017 to Bertonica complaining that the food policy violated his religious beliefs, plaintiff engaged in constitutionally protected conduct.  See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("[T]he filing of prison grievances is a constitutionally protected activity."); Mazyck v. Keller, No. 6:20-CV-06055 (EAW), 2021 WL 1201224, at *8 (W.D.N.Y. Mar. 31, 2021) ("An inmate's informal complaints or requests as well as formal grievances constitute protected activity under the First Amendment.").  Next, insofar as plaintiff contends that Bertonica issued a false misbehavior report, he has failed to establish sufficient adverse action, as "[i]t is well established that in the absence of aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report." Ciaprazi v. Goord, No. 9:02-CV-00915 (GLS/DEP), 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (citing Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  Indeed, the penalty resulting from Bertonica's misbehavior report was only a monetary fine of $10.35—and did not result in SHU confinement or any other disciplinary repercussions. See Dkt. No. 59-2 at 8; Cf. Waters v. Melendez, No. 15-CV-0805 (TJM/CFH), 2018 WL 3079764, at *10 (N.D.N.Y. May 18, 2018) ("A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action."), report and recommendation adopted, No. 9:15-CV-805 (TJM/CFH),

2018 WL 3069209 (N.D.N.Y. June 21, 2018), aff'd, 783 F. App'x 56 (2d Cir. 2019);

Melendez v. Costello, No. 6:12-CV-6226 (MAT), 2013 WL 5937052, at *3 (W.D.N.Y.

Nov. 1, 2013) ("[The] issuance of [a] misbehavior report that result[s] in [an inmate's]

allegedly wrongful confinement and recommended loss of good time credits sufficiently

describe[s] adverse conduct that would chill a reasonable inmate from exercising his

constitutional rights." (internal quotation marks and citations omitted).

Even assuming plaintiff could establish sufficient adverse action, he fails to

demonstrate a sufficient causal connection.  It is well settled that "[a]llegations of

adverse actions alone . . . are insufficient to establish retaliation absent facts supporting

an inference of a causal connection between the adverse actions and the protected

conduct."  Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).  Indeed, the

plaintiff "bears the burden of showing   . . . that the protected conduct was a substantial

or motivating factor in the prison officials' decision to" take the alleged adverse action.

Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks and

citation omitted).  Circumstantial factors indicating retaliatory motive include: (1)

temporal proximity between the protected activity and the alleged retaliatory act; (2) an

inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and

(4) statements by the defendant concerning his motivation.  See Baskerville, 224 F.

Supp. 2d at 732 (citing Colon, 58 F.3d at 872-73).  With regard to temporal proximity,

the Second Circuit "has not drawn a bright line to define the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-

Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

Here, plaintiff has asserted a close temporal proximity between his protected conduct and the alleged adverse action, as he suggests that Bertonica issued him a misbehavior report only nine days after submitting his second letter on October 16, 2017.  See Amen. Compl. at 48 ¶ 10.  However, "temporal proximity alone is insufficient to establish an inference of retaliation," Thomas v. Waugh, No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015), and the summary judgment record is devoid any other circumstantial evidence that supports an inference of retaliation.  For instance, plaintiff does not allege that Bertonica made any statements evidencing a retaliatory motive.  See Baskerville, 224 F. Supp. 2d at 732; see also Arce v. Walker, 58 F. Supp. 2d 39, 46 (W.D.N.Y. 1999) (granting summary judgment in favor of the defendants and dismissing the pro se inmate plaintiff's First Amendment retaliation claim where, "[t]here w[a]s no evidence to support [the plaintiff's] bald conclusion that the actions at Attica were retaliatory" and the plaintiff "d[id] not allege that anyone made any statements to him or that he overhead any comments or observed any acts that suggested an improper motive.").  Further, plaintiff was found guilty of the charges in Bertonica's misbehavior report.  See id.

In any event, defendants' admissible evidence establishes that Bertonica would have issued plaintiff the misbehavior report regardless of retaliatory motive.  "'[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.'"  Waters, 2018 WL 3079764, at *10 (quoting Jackson v. Onondaga Cty., 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008)).

70

Bertonica's misbehavior report demonstrates that plaintiff missed 12 meals between October 9, 2017, and October 13, 2017, in violation of DOCCS rules and his Therapeutic Diet Meals Attendance Agreement.  Dkt. No. 59-2 at 9.  Plaintiff does not dispute that he missed meals, wasted food, or violated his Therapeutic Diet Meals Attendance Agreement and, instead, argues only that he "was  . . . found guilty of choosing the Free Exercise of his sincerely held Rastafari Truth by not consuming food he knew to be served by an openly homosexual inmate[.]"  Dkt. No. 79 at 31 at ¶ 79.  Thus, even if Bertonica acted with retaliatory animus in issuing the misbehavior report, which plaintiff has failed to establish, his actions would have been taken for proper reasons and, therefore, "may be upheld" on the proper basis alone.  Waters, 2018 WL 3079764, at *10 (quoting Jackson, 549 F. Supp. 2d at 215.  Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Bertonica be dismissed.[8]

### b. Vanni, Porter, Silcox, Schenk  Relating to Caribbean African Unity Account

Defendants aver that, because the CAU was suspended based on its failure to comply with DOCCS Directive 4760, plaintiff cannot demonstrate that defendants took adverse action against him in retaliation for filing grievances regarding the alleged misappropriation of CAU funds.  See Dkt. No. 60 at 19.  Indeed, defendants contend, because the CAU's noncompliance with DOCCS Directive 4760 was "ongoing," plaintiff

---

[8]  Because plaintiff did not file Grievance No. AUB-73025-17 until On October 25, 2017—after Bertonica issued plaintiff the misbehavior report on October 19, 2017, no causal connection exists between that constitutionally protected conduct and alleged adverse action.  See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).

cannot establish a causal connection between the organization's cancellation and his grievances.  See id.

In support of their contentions, defendants proffer the declaration of Vanni, who explains that "the CAU had a history of noncompliance with the standards and requirements of DOCCS Directive [] 4760."  Dkt. No. 59-15 at 2 ¶ 6.  Vanni points out that, in 2018, "the CAU failed to meet the membership requirements" of DOCCS Directive [] 4760 by allowing membership to fall "below 25 members and not meeting the 20% of the approved membership size."  Id.  Further, Vanni notes that "the CAU did not have an approved program" in violation of Directive [] 4760.  Id.  Moreover, despite warnings that low membership, poor attendance, and lack of programs could result in suspension, and being placed on probationary status at least twice, the CAU did not meet its requirements in 2018, which resulted in suspension.  See id.  In addition, Vanni denies purposefully failing to process purchase orders, membership dues, or callouts, and states that "lack of interest" and "lack of programs and poor leadership" in the CAU resulted in its cancellation.  Id. at 2-3 ¶ 7.  She states that Directive No. 4760 "also required 50% of dues to be transferred."  Id.  Upon taking her position as Steward, Vanni states that she brought facility into compliance with Directive 4760, and held meetings with representatives of inmate organizations.  See id.  Attached to Vanni's declaration are two quarterly breakdowns from 2018 of the calculation of the 50% transfer of profits from the CAU to the IOTF.  See id. at 6, 7.

Defendants also proffer the declaration of Porter, who reiterates that the CAU had a history of noncompliance with the membership and program requirements of Directive 4760.  See Dkt. No. 59-5 at 1 ¶ 5.  Porter states that, "[i]n September 2018,"

after the CAU failed to bring its organization into compliance with Directive 4760 and after having been placed on two probationary periods, he "recommended . . . suspension." Id. at ¶ 6.  Attached as an exhibit to Porter's declaration is a copy of the Silcox's memorandum to Schenk recommending the suspension of the CAU based on its "violation of [D]irective 4760."  Id. at 7.  In particular, Silcox's report indicates that the CAU was noncompliant based on poor attendance at monthly meetings, paid membership of less than 20% of the approved size, and lack of programs.  See id. Further, the report noted that, during each of the CAU's 60-day probationary periods, the organization reached the minimum membership number of 25, but then fell below that minimum requirement "for several months."  Id.; see id. at 9 (notice of 60-day probation for non-compliance with Directive 4760, dated July 22, 2017); id. at 10 (notice of 60-day probation for non-compliance with Directive 4760, dated May 29, 2018).  At the time the report was drafted on September 6, 2018, the CAU had only 17 members, and had not had an approved program in over four years.  See id.  In addition, Silcox observed that its "sales products had been allowed to dwindle."  Id.  Also attached to Porter's affidavit is a list of the CAU membership as of September 6, 2018, which contains the names of 17 inmates.  See id. at 8.  McKoy approved the suspension of the CAU on January 11, 2019.  See id. at 4.

Defendants also proffer Schenk's declaration, who denies suspending the CAU in retaliation for plaintiff's grievances and complaints concerning the organization's alleged misappropriated funds and missing muffins.  See Dkt. No. 59-9 at 2 ¶¶ 6, 7. Rather, Schenk reiterates that the CAU was suspended for noncompliance with Directive 4760.  See id. at 10 ¶ 45.  In addition, Schenk explains that, at all times

relevant to the allegations in the Amended Complaint, she was employed by DOCCS as the Deputy Superintendent for Programs at Auburn C.F.  See id. at 1 ¶ 4.  However, as Schenk points out, and the January 11, 2019 document approving the suspension of the CAU corroborates, the Deputy Commissioner of Programs, McKoy—not Schenk—was responsible for "mak[ing] the final determination whether to permanently suspend the organization."  Id. at 3 ¶ 12.  Moreover, Schenk states that, in her role as Deputy Superintendent for Programs, she investigated plaintiff's complaints, as contained in his October 7, 2018 letter, concerning the CAU's funds and stolen muffins.  See Dkt. No. 59-9 at 7 ¶ 34.  Based on her investigation, she "determined that the CAU should be reimbursed in the amount of $94.34 for the missing muffins[,]" but "did not find that any DOCCS official had stolen or purposefully misplaced [them]."  Id. at 8 ¶ 36.  She also explains that she was never made aware of any error the Business Office may have made concerning the transfer into the IOTF of 50% of the CAU's net profits.  See id. at 10 ¶ 44.

In opposition, plaintiff argues "that at all times relevant to this matter the CAU maintained more than the 20% and was not in violation of the membership size quota."  Dkt. No. 79 at 32-33 ¶ 84 (emphasis omitted).  He avers that "[d]efendants . . . created the illusion of . . . low membership by manipulating the record and counting membership dues payments as sales . . . ."  Id. at 33 ¶ 88 (emphasis omitted).  Plaintiff also reasserts, generally, his arguments concerning the CAU as contained in his Amended Complaint.  See id. at 33-25 ¶¶ 86-98.

As an initial matter, as discussed in subsection III.B.1., supra, plaintiff's claims concerning the suspension of the CAU are unexhausted.  In any event, defendants'

admissible evidence establishes that the CAU would have been suspended regardless of any retaliatory animus Vanni, Porter, Silcox, and/or Schenk may have harbored against plaintiff, for noncompliance with Directive 4760.  As defendants' evidence demonstrates, the CAU was placed on probation at least twice for failing to comply with Directive 4760 insofar as it continuously failed to maintain the required number of members, hold programs, and generally suffered from a lack of interest and leadership. See Dkt. No. 59-5 at 1 ¶¶ 5, 6; id. at 7, 8, 9, 10; Dkt. No. 59-9 at 10 ¶ 45; Dkt. No. 59-15 at 2-3 ¶¶ 6, 7.  Thus, defendants' admissible documentary evidence establishes that the alleged adverse action "would have been taken based on the proper reason [of the CAU's failure to comply with Directive 4760] alone.'" Waters, 2018 WL 3079764, at *10 (quoting Jackson, 549 F. Supp. 2d at 215).   In addition, insofar as plaintiff contends that defendants violated DOCCS directives relating to the apportionment of CAU's net profits into the IOTF, plaintiff fails to state a constitutional violation.  See Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) "[A] violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983."), report and recommendation adopted, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013).  In any event, plaintiff's allegations concerning defendants' compliance with DOCCS Directives relating to the transfer a percentage of the CAU's net profits to the IOTF are belied by the admissible evidence of record.  See Dkt. No. 59-9 at 5 ¶ 19; Dkt. No. 59-15 at 6-7.  Consequently, it is recommended that plaintiff's First Amendment retaliation claims against Vanni, Porter, Silcox, Schenk be dismissed.[9]

---

[9]  In light of the analysis contained herein, the undersigned declines to address defendants' wholly conclusory argument, which consists solely of the black letter law of the qualified immunity standard

**IV. Conclusion**

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 59) be **DENIED IN PART** insofar as it seeks dismissal of plaintiff's First Amendment Free Exercise Clause claim based on the denial of plaintiff's attendance at the 2015 Transfiguration Day service and denial of the accompanying sacramental meal; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 59) be **GRANTED IN PART** and that plaintiff's remaining claims be **DISMISSED**; and it is

**RECOMMENDED**, that Pitoniak and the Doe defendants be *sua sponte* **DISMISSED** from this action without prejudice, due to plaintiff's failure to identify and/or serve these defendants; and it is further

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health

---

followed by the assertion, "[u]nder this standard, the [d]efendants are entitled to qualified immunity as a matter of law as [d]efendants acted with the reasonable belief that their action did not violate the law or [p]laintiffs' rights."  Dkt. No. 60 at 22.

and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[10]

     Dated: August 17, 2021
           Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[10] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

77